PASSAIC COUNTY PROBATION OFFICERS' ASSOCIATION, PLAINTIFF-APPELLANT, v. THE COUNTY OF PASSAIC, A BODY POLITIC OF THE STATE OF NEW JERSEY; ALPHONSE PEZZUTI, CHIEF PROBATION OFFICER OF THE PASSAIC COUNTY PROBATION DEPARTMENT; RONALD PARKER, PASSAIC COUNTY COURT ADMINISTRATOR; AND THE JUDGES OF THE COUNTY COURT OF PASSAIC COUNTY, DEFENDANTS-RESPONDENTS.

Argued March 23, 1976—Decided May 16, 1977.

248

*Mr. Lawrence A. Whipple, Jr.,* argued the cause for appellant (*Messrs. Zazzali and Zazzali,* attorneys).

*Mr. Michael S. Bokar,* Deputy Attorney General, argued the cause for respondents (*Mr. William F. Hyland,* Attorney General of New Jersey, attorney; *Mr. Stephen Skillman,* Assistant Attorney General, of counsel; *Mr. Bokar* on the brief).

The opinion of the court was delivered by

MOUNTAIN, J. On December 16, 1974, the Chief Probation Officer of Passaic County issued a directive, to take effect January 6, 1975, specifying that the working hours of probation officers in the employ of the county would thereafter extend from 9:00 A.M. to 4:30 P.M. Their schedule had theretofore required attendance only from 9:00 A.M. until 4:00 P.M. This change in working hours was responsive to action of this Court similarly extending the period of time during which trial judges would routinely hold court. The directive followed the passage of a resolution by the County Court Judges of Passaic County, adopted

October 30, 1974, which ordered that the daily work span be so enlarged.[1]

At all relevant times the Passaic County Probation Officers' Association, plaintiff in this action, was acknowledged to be the duly chosen and accredited representative of the probation officers employed by the County of Passaic. Admittedly the resolution was adopted and the directive issued without prior consultation or discussion with the Association. The latter instituted this action seeking to enjoin the enforcement of the directive on the ground that it was in violation of *N. J. S. A.* 34:13A-5.3[2] and to compel the Judges of the County Court of Passaic County forthwith to negotiate in good faith with the plaintiff as to the proposed modification of probation officers' hours of work. An order to show cause issued but temporary restraints were denied. Following a hearing on the return day of the order to show cause, Judge Gelman filed a written opinion, 132 *N. J. Super.* 247 (Ch. Div. 1975), holding that the directive did not modify any existing rule governing working conditions within the meaning of *N. J. S. A.* 34:13A-5.3, but instead, was a reasonable exercise of the judges' administrative and supervisory authority over probation officers, conferred by *N. J. S. A.* 2A:168-7. The Association appealed to the Appellate Division. We certified the cause on our own motion while the appeal was there pending. 68 *N. J.* 497 (1975).

This case requires us to consider the extent of this Court's constitutional authority and responsibility with re-

---

[1] In New Jersey probation officers are appointed by judges of the county court. *N. J. S. A.* 2A:168-5; *In re: Salaries for Probation Officers of Bergen County*, 58 *N. J.* 422, 425 (1971).

[2] This is a section of the New Jersey Employer-Employee Relations Act, *N. J. S. A.* 34:13A-1 *et seq*. The portion of the statute upon which plaintiff places principal reliance reads as follows:

Proposed new rules or modifications of existing rules governing working conditions shall be negotiated with the majority representative before they are established. [*N. J. S. A.* 34:13A-5.3]

spect to the management, supervision and control of the administration of the judicial system within this State. More especially, we are called upon to consider this authority in relation to those public employees whose duties make them a necessary and integral part of our court system. This examination must take particular account of such public employees' rights, also deriving from the Constitution, to organize, and present and make known their grievances and proposals through representatives of their own choosing. *N. J. Const.*, Art. 1, ¶ 19.

We first address ourselves to the question of the extent of this Court's authority and obligation with respect to the administration of the judicial system. The New Jersey Constitution of 1947 contains the following provisions:

> *The Supreme Court shall make rules governing the administration of all courts in the State* and, subject to law, the practice and procedure in all such courts. The Supreme Court shall have jurisdiction over the admission to the practice of law and the discipline of persons admitted. [*N. J. Const.*, Art. 6, § 2, ¶ 3; emphasis added]
> The Chief Justice of the Supreme Court shall be the administrative head of all the courts in the State. He shall appoint an Administrative Director to serve at his pleasure. [*N. J. Const.* Art. 6, § 7, ¶ 1]

It has been said — with these constitutional provisions in mind — that

> [t]he intent of the 1947 Constitutional Convention was to vest the Supreme Court with the broadest possible administrative authority. Conceptually, such authority encompasses all facets of the internal management of our courts. . . . This was made clear by the Committee on the Judiciary which considered it a fundamental requirement that the courts be vested with 'exclusive authority over administration.' 2 *Proceedings of the Constitutional Convention of 1947*, at 1180. . . . [*Lichter v. County of Monmouth*, 114 *N. J. Super.* 343, 349 . (App. Div. 1971)][3]

Chief Justice Weintraub shared precisely the same view. He said that *N. J. Const.*, Art. 6, § 2, ¶ 3 conferred upon

---

[3]The words are those of Judge Arthur W. Lewis, who had himself been a delegate to the Constitutional Convention of 1947.

this Court "plenary responsibility for the administration of all courts in the State." *State v. DeStasio,* 49 *N. J.* 247, 253 (1967), and that "this Court is charged with responsibility for the overall performance of the judicial branch. Responsibility for a result implies power reasonably necessary to achieve it." *In re Mattera,* 34 *N. J.* 259, 272 (1961).

Chief Justice Vanderbilt had very forcefully expressed the same conviction.

There can be no doubt in the mind of anyone familiar with the work of the Constitutional Convention or with the ensuing election at which the Constitution was adopted by the people that, along with the desire to strengthen the powers of the Governor and to amplify the powers of the Legislature, there was a clear intent to establish a simple but fully integrated system of courts and to give to the judiciary the power and thus to impose on them the responsibility for seeing that the judicial system functioned effectively in the public interest. Indeed, in the minds of many, if not a majority, of our citizens this was the primary reason for their desire for a new constitution. [*Winberry v. Salisbury,* 5 *N. J.* 240, 244; *cert.* denied, 340 *U. S.* 877, 71 *S. Ct.* 123, 95 *L. Ed.* 638 (1950)]

In the same suit, Justice Case, concurring, characterized this constitutional provision as placing ". . . the administration of the courts within the unfettered control of the Supreme Court. . . ." 5 *N. J.* at 257. He went on to point out that whereas this Court, in exercising its power to make rules governing practice and procedure, must do so "subject to law," that, by way of contrast, there was no such constricting clause applicable to its power to make rules governing the administration of the courts. 5 *N. J.* at 259. Here its power was plenary, measured only by its responsibility to insure fulfillment of its obligation to maintain an effective system of judicial administration.

The meaning of the constitutional provisions quoted above, as they have been consistently read and interpreted, is so clear and their purpose so manifest as to leave not the slightest doubt that this Court possesses plenary authority with respect to all matters touching the administration of the court system of New Jersey. Upon it also

rests the concomitant responsibility to see that the public interest is fully served by the proper functioning of this vital branch of our government.[4]

With this in mind we consider whether probation officers are so integral a part of our court system as to bring them within the scope of this power. We believe the trial court correctly suggested the answer when it said:

Probation officers function as an enforcement arm of the judicial system. *Godfrey v. McGann*, 37 *N. J.* 28 (1962). In criminal matters they conduct investigations and submit presentence reports and recommendations, supervise probationary sentences and collect fines; on the civil side they likewise conduct investigations and submit reports in a variety of matters at the direction of the judges, collect and enforce support orders and supervise judgments entered by the courts. *N. J. S. A.* 2A:168–11, 13. In sum, they perform services for the judiciary essential to the fair and efficient administration of justice. [132 *N. J. Super.* at 250–251]

The probation office in each county has been aptly described as "an arm of the state judicial system." *Essex County Welfare Board v. Perkins,* 133 *N. J. Super.* 189, 196 (App. Div. 1975). *See also, In re: Salaries for Probation Officers of Bergen County, supra; R.* 1:34–4.

It accordingly seems clear that probation officers play an important and indeed vital role in the administration of justice, both in the criminal and civil courts, throughout the State. It follows that as an integral part of the court system, they necessarily come within the regulatory control and superintendence of this Court.

---

[4]This constitutional allocation to the Supreme Court of full power to administer the court system of the State met with general and widespread approval. For instance, Dean Pound observed that

[t]he best provision for general administration [of courts] is made in the federal court system and in New Jersey.

[F]or the United States the reorganized federal judicial system as it now stands, and the reorganization in New Jersey are the best thus far achieved. [5 *Pound, Jurisprudence* 408–09 (1959)]

The people of New Jersey will exchange America's worst court system for America's best. [31 *Judicature* 131 (1948)]

Thus we reach the important issue as to whether, while subject to judicial supervision resting upon a constitutional mandate, probation officers can also be subject to *N. J. S. A.* 34:13A–1 *et seq.*, the New Jersey Employer-Employee Relations Act. Stated more generally, can the control of probation officers and of the whole statewide system of probation, seemingly entrusted to the Judiciary by the terms of the Constitution, be in any way diluted or modified by legislation? Subject to what is set forth below, we think it clear that it cannot. As Chief Justice Vanderbilt observed in *Winberry v. Salisbury, supra,*

Complete power and responsibility in the judiciary are concepts quite inconsistent with the notions of overriding legislation.

[5 *N. J.* at 249]

The authority conferred upon this Court by *N. J. Const.*, Art. 6, § 2, ¶ 3, to make rules governing the administration of the judicial system, was not to be found in our earlier Constitutions of 1776 and 1844. It first appeared in the Judicial Article of the Constitution of 1947 and became effective September 15, 1948. *N. J. Const.*, Art. 11, § 4, ¶ 14. At that time there were, of course, on the statute books multiple and farflung legislative arrangements that, in one way or another, were concerned with the administration of the courts of the State and with those public employees who were part of the court system. Examples, as to the latter, might include statutes concerning pension rights, those concerning workmen's compensation benefits or those having to do with civil service. Each of these bodies of legislation — and others as well — affects public employees, including those engaged in aspects of judicial administration. Since September, 1948 much other legislation, of the kind described above, has been adopted, including the New Jersey Employer-Employee Relations Act, which the plaintiff here invokes. The question then arises as to whether these statutory arrangements have precedence over rules of this Court promulgated pursuant to

its obligation to insure a proper administration of the court system.

The conclusion is quite inescapable that the constitutional mandate given this Court to "make rules governing the administration of all courts in the State" transcends the power of the Legislature to enact statutes governing those public employees properly considered an integral part of the court system. It has, however, since 1948, been the practice of this Court, with only occasional deviation, to accept and adopt legislative arrangements that have not in any way interfered with this Court's constitutional obligation discussed above. We have every intention of continuing this practice; to do otherwise would be pointless and self-defeating. Only where we are satisfied that the proper exercise of our constitutional responsibility to superintend the administration of the judicial system requires such action would we feel compelled to exert this power in the adoption of a rule at odds with a legislative enactment. We repeat that in the absence of any action by this Court — felt to be constitutionally compelled — and as a matter of comity and respect for other branches of government, we accept and adopt all statutory arrangements touching or concerning the administration of any courts in the State, as well as such legislative enactments as have to do with public employees whose duties are intimately related to the judicial system.

With these thoughts in mind, we turn to plaintiff's claim that *N. J. S. A.* 34:13A–5.3 gives it the right to insist upon prior negotiations before Passaic County probation officers, for whom it is the conceded representative, are compelled to work longer hours. The present employment contract does not mention hours of work. As the trial court opinion explained,

On August 28, 1972 the Administrative Director issued a memorandum to judges and chief probation officers setting forth the position of the Supreme Court with respect to the conduct of negotiations with probation officers under the New Jersey Employer-Employee Relations Act. Among other matters the Administrative Di-

rector noted that "Fixed Hours of Work or Overtime Pay" were non-negotiable items as a matter of Supreme Court policy. [132 *N. J. Super.* at 251–52]

The trial judge correctly treated the memorandum in question as having been sanctioned and constitutionally justified by this Court's power and obligation "to make rules governing the administration of all courts in the State." 132 *N. J. Super.* at 252. This is clearly so; it is one of the few instances where this Court has exercised this power in a way that may conflict with legislation.

Although Judge Gelman quite understandably concluded the matter at this point, we would go one step further. We think the County Court Judges should have allowed the plaintiff to present and make known its grievances, to be followed by bona fide discussion. The Constitution includes the following relevant paragraph:

Persons in private employment shall have the right to organize and bargain collectively. Persons in public employment shall have the right to organize, present to and make known to the State, or any of its political subdivisions or agencies, their grievances and proposals through representatives of their own choosing.

[*N. J. Const.*, Art. 1, ¶ 19]

Although this Court had issued the memorandum mentioned above, taking the position that hours of work were not negotiable, plaintiff, as we read the Constitution, was entitled to urge that this position be changed. It was entitled to urge that hours of work *become* negotiable, and even if non-negotiable, that the earlier span of time be allowed to remain in force, setting forth whatever arguments it felt disposed to present in support of its position. In effect, this change in hours of work was its "grievance", which the Constitution says it may "present and make known." We think it should have been allowed to do so. We believe that plaintiff, as the chosen representative of the probation officers, had a right, deriving directly from the Constitution, and quite apart from statute, to press upon this Court its view

with respect to the negotiability of hours of work. We have constantly in mind our continuing obligation to be scrupulously careful to see that in exercising the constitutional right and obligation imposed upon this Court to "make rules governing the administration of all courts in the State," we do not in any way diminish, or hamper the exercise of constitutional rights and privileges bestowed upon others.

It is our judgment that plaintiff be accorded forthwith an opportunity to present any grievance or proposal it may wish to the defendant County Court Judges of Passaic County, addressed to the action taken by the Chief Probation Officer on December 16, 1974. Such presentation presupposes that good faith discussions will thereupon ensue. Should the County Court Judges, in the course of such discussions, find themselves unduly constricted by then existing directives of this Court, they are of course always at liberty to suggest or seek modification or relaxation, through the Administrative Director of the Courts, from this Court itself. Should grievances or proposals so presented have to do with salaries or expenses of probation officers, appropriate notice and opportunity to be heard should be given the board of chosen freeholders. *N. J. S. A.* 2A:168–5, 2A:168–8.

As thus modified the judgment of the trial court is affirmed.

CONFORD, P. J. A. D., Temporarily Assigned, dissenting. It is fairly implicit in the Court's opinion that it declines to hold the plaintiff entitled to the relief provided public employees under the New Jersey Employer-Employee Relations Act, *N. J. S. A.* 34:13A–1 *et seq.*; 34:13A–5.3 (hereafter "labor relations act"), for unilateral change in working hours imposed by the employer without prior negotiation with the representative of the employees, on the ground that the act unconstitutionally impairs the administrative rule-making power of the Supreme Court. Thus the Court's judgment studiously avoids use of the statutory term, "negotiations", *N. J. S. A.* 34:13A–5.3, 5.4 a(5), in directing good faith

"discussions" between plaintiff and the county court judges, acting as the Supreme Court's representatives, on the plaintiff's grievance. (p. 257). The Court further makes its nullification of the labor relations act as to Court employees plain when it holds that hours of work are not mandatorily negotiable, as the act expressly says they are, but that the Judiciary employees merely have the right, under *N. J. Const.* 1947, Art. 1, par. 19, to "urge" upon the court representatives that "hours of work *become* negotiable * * *". (emphasis by the Court) (p. 256).

I dissent because I regard the labor relations act as completely free of any impairment of the Court's authority and right under *N. J. Const.* 1947, Art. 6, Sec. 2, par. 3 to make rules of administration for all the courts of this State. With all deference, I believe it highly regrettable that the Court does not attempt to harmonize the legislative policy as to the rights of public employees[1] with the Court's rule-making authority rather than go out of its way to find an insuperable conflict between those subjects. The effect of the Court's decision is to create an invidious wall between the employees of the other branches of government and those of the Judici-

---

[1] It is well to be reminded of the text of the public policy underlying the labor relations act as stated in *N. J. S. A.* 34:13A-2:

It is hereby declared as the public policy of this State *that the best interests of the people of the State are served by the prevention or prompt settlement of labor disputes, both in the private and public sectors;* that strikes, lockouts, work stoppages and other forms of employer and employee strife, regardless where the merits of the controversy lie, are forces productive ultimately of economic and public waste; that the interests and rights of the consumers and the people of the State, while not direct parties thereto, should always be considered, respected and protected; and *that the voluntary mediation of such* public and private employer-employee *disputes under the guidance and supervision of a governmental agency will tend to promote permanent, public and private employer-employee peace and the health, welfare, comfort and safety of the people of the State.* To carry out such policy, the necessity for the enactment of the provisions of this act is hereby declared as a matter of legislative determination.

(emphasis added).

ary, barring the latter from the full panoply of negotiating rights and remedies accorded the former under the labor relations act. I find this result to constitute both unacceptable constitutional law and unfortunate public policy.

To begin with, the Court is in the sensitive and difficult position in this case of an agency which has the parochial interest in the outcome of an employer and administrator, and, at the same time, the solemn and non-delegable responsibility of an impartial judicial exponent of the meaning of the Constitution and the laws in relation to the rights of state employees in the Judicial branch. Under such circumstances, it seems to me incumbent upon the Court to render a painstaking demonstration of precisely how and why the labor relations act, attended as it is by the presumption of validity of all legislation, cannot stand as a valid enactment as to Judiciary employees alongside the Judicial Article of the Constitution. I believe the Court's opinion fails to do that.

The Court recognizes that the guaranty of the 1947 Constitution for collective labor relations rights of public employees applies to employees of the Judiciary as well as of the other branches of State government. (pp. 256, 257) We have previously held that the labor relations act of 1968 was enacted in the continuing power of the Legislature "to both substantively and procedurally flesh out the constitutional [labor relations] guarantees". *Lullo v. Intern. Assoc. of Fire Fighters,* 55 *N. J.* 409, 416 (1970). The specific complaint of the plaintiff in this case is that the representatives of the Judiciary unilaterally changed existing hours of employment in violation of the statutory requirement that changes in rules governing working conditions should be negotiated with representatives of the employees before being established. *N. J. S. A.* 34:13A–5.3. That claim appears to be *prima facie* justified and warrants a remedial judgment by the Court in accordance with the statute.

I discern no basis whatever for the Court's conclusion, gratuitous on the narrow issue here presented, that adoption of the labor relations act has impermissibly diluted or modi-

fied the Court's constitutional authority to administer the judicial system. The Court notes that when the Constitution was adopted in 1947 there was then in existence a substantial body of legislation governing the rights, privileges and obligations of public employees. It cannot be thought that in giving this Court plenary power to administer the judicial system the drafters of the 1947 Constitution were intending to cast a cloud over existing pension and civil service legislation affecting Judiciary employees or over the right of the Legislature to continue to enact statutes protective of all public employees whether in the judicial or the other branches. Legislation affording public employees reasonable protection in respect of collective negotiations concerning compensation and working conditions obviously belongs in that genre, particularly when it is in appropriate implementation, as we expressly recognized in *Lullo, supra,* of the constitutional guaranty of negotiating rights vouchsafed public employees for the first time in our history at the 1947 Convention. In these respects it is, to me, simply unthinkable that the constitutional delegates contemplated Judiciary employees to be entitled to lesser rights than those of employees in the other branches.

In construing any provision of the Constitution of 1947, we are called upon, "as in the construction of statutes, to consider the whole of the instrument, with a view of arriving at the true intention of each part * * *". *Gangemi v. Berry,* 25 *N. J.* 1, 10 (1957). And in interpreting the interaction of the constitutional grant of plenary rule-making power to the Supreme Court with the constitutional-statutory grant of collective negotiating rights to public employees, it is fundamental that if at all possible the grants should be read to harmonize rather than conflict with each other. *Cf. Richman v. Ligham,* 22 *N. J.* 40, 44 (1956) ; *Behnke v. New Jersey Highway Authority,* 13 *N. J.* 14, 24 (1953). Applying these principles, we should not be astute to find invidious invasion of the Court's administrative authority in reasonable and salutary legislative implementation of the constitutional

rights of public employees to effective collective negotiations concerning their pay and working conditions.[2] We should, rather, be predisposed to find a mutual and constitutional accommodation between them. In such a spirit, it seems to me self-evident that the application of the labor relations act to Judiciary employees should not be deemed impermissibly to dilute or modify this Court's effective authority to administer the judicial organization — any more than, for example, the civil service statutes and regulations could be argued to do so.

If it is the Court's implicit position that any legislation which even incidentally renders more inconvenient any aspect of judicial administration is for that reason an invalid interference with the Court's constitutional powers, then much of the civil service legislation would be vulnerable. For example, the obligation of Judiciary supervisory officers to comply with civil service statutes and regulations concerning personnel hiring, firing, examinations, seniority, promotions, etc., undoubtedly renders administration at times less convenient and efficient. Yet one cannot imagine the Court ever holding that any of the civil service statutes unconstitutionally "dilute" or "modify" the Court's rule-making authority. Nor can one conceive the Court effecting the same result by an administrative directive purportedly addressed to administration of the courts but actually nullifying one of the specific civil service protections of employees. I cannot see why these observations are not equally true as to the labor relations act.

---

[2] The labor relations act has been said to "reflect a state policy to promote voluntary resolutions of public employer-employee disputes over terms and conditions of employment". *Pros., Det., Essex Cty. v. Hudson Bd. Freeholders*, 130 *N. J. Super.* 30, 45 (App. Div.), certif. den. 66 *N. J.* 330 (1974).

In promoting employee morale, the labor relations act undoubtedly contributes substantially to the efficient operation of any governmental agency, including the Judiciary.

The Court's reliance on the language and purpose of the constitutional rule-making authority of the Supreme Court does not persuasively advance the thesis that it precludes legislation regulating labor relations with Judiciary employees. Concededly, the Constitution gives the Court power to make rules governing administration of all courts, and conspicuously fails to make such power "subject to law", as contrasted with the power given in the same paragraph to make rules governing practice and procedure, which power is expressly declared to be "subject to law". As accurately explained by Justice Case, concurring in *Winberry v. Salisbury,* 5 *N. J.* 240, 260, *cert.* den. 340 *U. S.* 877, 71 *S. Ct.* 123, 95 *L. Ed.* 638 (1950), the intent of the Committee on the Judiciary at the Constitutional Convention of 1947, in submitting the provision here under discussion, as expressly set forth in its report to the Convention, *II Proceedings Constitutional Convention of 1947,* 1180, 1183, was that responsibility for administration was vested in the Supreme Court without limitation whereas in respect of practice and procedure the power was subject to legislative revision, repeal or initiation of new provisions.[3] To me, however, this simply means that the Legislature may not abrogate or change a rule of administration of the courts. If, for example, the Supreme Court by rule or directive orders the trial courts to function from 9:00 A.M. to 4:30 P.M., the Legislature may not enact a statute declaring that court hours shall be from 9:00 A.M. to 3:00 P.M.

[3] The fact that a majority of the Court in *Winberry* by *dictum* construed the words "subject to law" to mean merely subject to substantive law, 5 *N. J.* at 247, a construction later confirmed by holding in *George Siegler Co. v. Norton,* 8 *N. J.* 374, 381–382 (1952), does not affect the point made in the text — that the purpose of the constitutional distinction between administration and practice and procedure was to render the Court's power exclusive in respect of administrative rule-making, but not to permit the Court to veto social legislation having only a remote and incidental relation to court administration.

But for the Court to enlarge the intent of the Constitution makers, from the text of the Judicial Article quoted above, to one of preclusion of any legislation to reflect the progressive views of the public at large with respect to sound labor-management relations between the state government as employer and state employees, whether in the Judiciary or the other branches, would be for the Judiciary to invade the legitimate sphere of legislative hegemony over general public policy in a wholly inadmissible fashion. This would be so, I believe, even if there were no express treatment of the rights of public employees in the Constitution. But the point is accentuated by the fact that there is an express constitutional guaranty on the matter — a guaranty which this Court in *Lullo, supra,* has held to be appropriately implemented by the labor relations act which it now nullifies in respect of Judiciary employees.

The position the Court takes here is in notable contrast with that it took in dealing with the same subject matter — a labor contract negotiated between county court judges and probation officers — in *In re Salaries Prob. Off. Bergen County,* 58 *N. J.* 422 (1958). We there frankly avowed the existence of labor negotiations and agreements between Judiciary representatives and probation officers effected under and pursuant to the labor relations act, 58 *N. J.* at 424–425, and we held the arrangements valid as against various attacks by the Bergen County Board of Freeholders. It was clearly implicit that the process we were there upholding was not in violation of this Court's exclusive control over rules of administration. See also *Pros., Del., Essex Cty. v. Hudson Bd. Freeholders, supra,* 130 *N. J. Super.* at 45.

I am convinced (1) that the Judiciary as a state employer must tolerate such incidental inconvenience in administration as attends affording Judiciary employees their rights under the labor relations act, nothing in the Judicial Article of the Constitution being to the contrary either expressly or by fair intendment; and (2) that acceptance

of proposition (1) does not pose any substantial threat to the proper and efficient administration of the judicial organization by this Court and the Chief Justice. No effort to demonstrate the contrary is attempted in the Court's opinion.

The cases cited by the Court expatiating on the powers of the Supreme Court over administration of the courts do not in any way support the thesis of invalidity of the labor relations act in relation to Judiciary employees. *Lichter v. County of Monmouth,* 114 *N. J. Super.* 343 (App. Div. 1971), rejected a complaint by court reporters concerning the validity of a court rule requiring installation of sound recording devices in all municipal courts. *State v. De Stasio,* 49 *N. J.* 247, *cert.* den. 389 *U. S.* 830, 88 *S. Ct.* 96, 19 *L. Ed.* 2d 89 (1967), upheld the Court's directive for sentencing of all gambling offenders by a single judge in the county. *In re Mattera,* 34 *N. J.* 259 (1961), was concerned with methods of enforcing court rules in case of disobedience by an officer. Only in *Winberry v. Salisbury, supra,* was the Court speaking of constitutional intent concerning immunity of court rules from overriding legislation. The subject matter there was rules regulating practice and procedure. But even there, as noted above, the Court was conceding the supremacy of substantive law. 5 *N. J.* at 247. Labor relations legislation is obviously substantive law. Certainly this Court could not abrogate or alter the labor relations statute by exercise of its rule-making power as to practice and procedure. *A fortiori* it has no such power in purported exercise of its administrative rule-making jurisdiction.

It is a corollary of this dissent that "acceptance" by this Court of legislation affecting the welfare and rights of public employees must be as a matter of recognition and exposition by the Court of the law, not merely "as a matter of comity and respect for other branches of the government"; see p. 255. We should as a matter of law accept and apply this legislation if it does not abrogate or

alter a rule of administration of the courts adopted by this Court; we should strike it down if it does. In my judgment, the New Jersey Employer-Employee Relations Act, insofar as anything argued before us or contained in the Court's opinion is concerned, does not abrogate or alter a rule of judicial administration, directly or indirectly, nor impermissibly interfere with such administration. I would therefore accord it full recognition in this case and order appropriate relief thereunder on behalf of the plaintiff.

*For affirmance as modified*—Chief Justice HUGHES and Justices MOUNTAIN, SULLIVAN, PASHMAN, CLIFFORD and SCHREIBER—6.

*For reversal*—Judge CONFORD—1.