572 A.2d 613

CWA LOCAL 1044, PLAINTIFF–APPELLANT, AND LOCAL 102, INTERNATIONAL BROTHERHOOD OF TEAMSTERS, CHAUFFEURS, WAREHOUSEMEN AND HELPERS OF AMERICA, AFL–CIO, PLAINTIFF, v. THE HONORABLE CHIEF JUSTICE OF THE SUPREME COURT AND THE HONORABLE ASSOCIATE JUSTICES OF THE SUPREME COURT; THE HONORABLE ASSIGNMENT JUDGE OF BURLINGTON COUNTY; AND THE HONORABLE ASSIGNMENT JUDGE OF UNION COUNTY, DEFENDANTS–RESPONDENTS.

Argued November 27, 1989—Decided April 18, 1990.

*Steven P. Weissman* and *Michael J. Sweeney* argued the cause for appellants (*Sweeney & Sweeney,* attorneys; *Steven P. Weissman, John A. Sweeney,* and *David Sherman,* on the briefs).

*Michael L. Diller,* Deputy Attorney General, argued the cause for respondents (*Peter N. Perretti, Jr.,* Attorney General

of New Jersey, attorney; *Mary C. Jacobson,* Deputy Attorney General, of counsel).

PER CURIAM.

In this matter it is contended that the Court is compelled, by virtue of its decision in *Passaic County Probation Officers' Association v. County of Passaic,* 73 *N.J.* 247, 374 *A.*2d 449 (1977), to include in collective negotiations with judicial employee organizations the issue of agency fees in accordance with *N.J.S.A.* 34:13A–5.5(a). The statutory provision requires the public employer, here the judiciary, if requested by the employees' union, to negotiate in good faith whether the substantial equivalent of union dues—"agency fees"—shall be paid, through payroll deductions, by non-union members who form part of the negotiating unit. The judiciary thus far has refused to negotiate on this issue. Additionally, it is contended that this difference in treatment—judiciary employees being the only public employees whose labor organizations are unable to negotiate that issue—violates the New Jersey constitutional requirements of equal protection and substantive due process. *N.J. Const.* of 1947 art. I, ¶ 1.

These claims are made with substantial force and a legitimacy that inevitably attaches to their support in legislative policy. Nevertheless, we determine that the judiciary is not compelled by the *Passaic* case or by the statute to negotiate this issue. Rather, pursuant to the Court's exclusive power under our Constitution over the administration of the judicial system (art. VI, § II, para. 3), we hold that the question is committed to the Court's discretionary authority, to be determined in accordance with the legitimate interests of the judiciary in sound labor relations guided by the principles previously established in case law. While the determination to withhold negotiation of this term continues, it has always been regarded as an interim determination, justified by both the rapid changes that have taken place in judicial labor relations and the uncer-

tainties that surround its future development. As more fully explained below, the Chief Justice, in his constitutional capacity as administrative head of the judicial branch of government, has indicated that the question is presently under consideration and that he will present it to us along with his views on completion of his review in the near future.

Given this impending administrative reconsideration of the issue, we do not decide the constitutional questions. We retain jurisdiction, however, in order to afford plaintiff CWA the opportunity, by motion made to this Court, to reassert its constitutional claims following our forthcoming administrative disposition of the case.

I.

This action is brought by two labor unions representing judicial employees, CWA Local 1044 and Local 102, International Brotherhood of Teamsters, Chauffeurs, Warehousemen and Helpers of America, AFL–CIO. CWA 1044 is the only appellant (referred to sometimes as plaintiff), Local 102 not having appealed from the trial court's adverse determination. This action was preceded by another in the Federal District Court requesting similar relief but including federal constitutional claims not advanced here. It was ultimately dismissed on abstention grounds in an unreported decision, preserving to CWA 1044 (Local 102 was not a party) the right to reopen the action if dissatisfied with the outcome of State proceedings. *See Burford v. Sun Oil Co.*, 319 *U.S.* 315, 63 *S.Ct.* 1098, 87 *L.Ed.* 1424 (1943); *Railroad Comm'n of Texas v. Pullman Co.*, 312 *U.S.* 496, 61 *S.Ct.* 643, 85 *L.Ed.* 971 (1941). This lawsuit followed. No federal claims are asserted here, plaintiff CWA reserving them in the event of its return to the Federal District Court.

CWA 1044 is a Local of the Communications Workers of America organizing, among other places, in Burlington County. The Local represents substantially all the public employees of

that county, namely, the employees of the Board of Freeholders and some related agencies, as well as a substantial number of judicial employees, all in the same collective negotiating unit. The judicial employees include all employees of the probation office (except probation officers themselves, who are organized in another unit represented by the Probation Officers' Association of Burlington County), all employees of the Surrogate, all employees on the County Clerk's judicial budget, all support staff of the Special Civil Part of the Superior Court, and all administrative and other employees on the payroll of the Burlington County Superior Court.

In February of 1986, Local 1044 concluded a collective negotiating agreement with the county for the years 1986–1988 purporting to cover all the public employees in the mixed unit, including the judicial employees. It included a standard agency-fee clause requiring payment to the union by non-union members of a representation fee (up to 85% of regular union dues) in accordance with the statute. The agreement was not executed by the Assignment Judge nor, apparently, did the judiciary participate in its negotiation. The Assignment Judge thereafter advised the union that despite the collective negotiating agreement, agency fees could not be deducted from the payroll for judiciary employees. After the dismissal of the Federal District Court action challenging the Court's policy in this respect, plaintiffs commenced this action, resulting in a summary judgment in favor of the named defendants, being the members of this Court and the two Assignment Judges. The trial court based its decision on this Court's exclusive power over the administration of the court system, including the power to determine its own policies in the judicial labor relations field, despite conflicting legislative provisions. Concerning the constitutional contentions, the decision below was based on the trial court's perception of the present policy as temporary and therefore able to withstand attack on equal protection and due process grounds. Local 1044 appealed and we certified the matter directly. See *Rule* 2:12–2.

## II.

 We deal first with the contention that the Court is compelled by its decision in *Passaic County Probation Officers' Association v. County of Passaic, supra,* 73 *N.J.* 247, 374 *A.*2d 449 (1977) (*Passaic I*) to negotiate the agency-fee issue. That case involved a directive of the judiciary, issued by a chief probation officer, changing the working hours of probation officers, previously 9:00 a.m. to 4:00 p.m., by extending them to 4:30 p.m. The change, to conform those hours to the regularly scheduled court hours of trial judges, was effected without negotiations with the probation officers. The judiciary's directive thus conflicted with the statute (*N.J.S.A.* 34:13A–5.3) that required such a change to be negotiated with the probation officers' elected representative before it was put into effect. We held that the change was mandated by the needs of the effective administration of the courts and that the judiciary's constitutional responsibility to meet those needs took precedence over the statute. After concluding that probation officers were so integral a part of the judiciary as to bring them within the scope of our constitutional power, we made the following observation:

> The conclusion is quite inescapable that the constitutional mandate given this Court to "make rules governing the administration of all courts in the State" transcends the power of the Legislature to enact statutes governing those public employees properly considered an integral part of the court system. It has, however, since 1948, been the practice of this Court, with only occasional deviation, to accept and adopt legislative arrangements *that have not in any way* interfered with this Court's constitutional obligation discussed above. We have every intention of continuing this practice; to do otherwise would be pointless and self-defeating. Only where we are satisfied that the proper exercise of our constitutional responsibility to superintend the administration of the judicial system requires such action would we feel compelled to exert this power in the adoption of a rule at odds with a legislative enactment. We repeat that in the absence of any action by this Court—felt to be constitutionally compelled—and as a matter of comity and respect for other branches of government, we accept and adopt all statutory arrangements touching or concerning the administration of any courts in the State, as well as such legislative enactments as have to do with public employees whose duties are intimately related to the judicial system. [73 *N.J.* at 255, 374 *A.*2d 449 (emphasis supplied).]

Plaintiff would read that language as somehow creating an inflexible rule of law restricting this Court's constitutional, exclusive power over the administration of the judiciary. It claims that this Court may adopt rules of administration in conflict with a statute only when it is "constitutionally compelled" to do so, thereby implying an extremely narrow scope to our power to govern the courts. We disagree. Very simply, and fairly read, that case sets forth this Court's policy that when a statute has an impact on our administration, we will follow it unless it interferes with the effective functioning of the courts. And so we have done. The occasions when we have concluded that our exclusive responsibility to administer the judicial system calls for a result different from that ordained by the Legislature are few. In this spirit of comity, we will continue to defer to the Legislature. But our obligation to give the people of this state effective administration of justice, squarely imposed on us by the constitutional grant of exclusive responsibility over the administration of the court system, cannot be diluted, as it would be, by plaintiff's restrictive interpretation of *Passaic I*. Rather, in each instance we must examine the terms of the legislative enactment, its importance, the extent of its interference with sound judicial administration, and the significance of the issue to the judiciary, ultimately striking a balance between the interests served by comity and those served by the administration of justice. The reams of statutory material with which we have complied overwhelm the few instances when we have gone our own way. See, *e.g.,* *Greenberg v. Kimmelman,* 99 *N.J.* 552, 494 *A.*2d 294 (1985); *Knight v. Margate,* 86 *N.J.* 374, 431 *A.*2d 833 (1981), and cases cited therein.

Here the question relates to one term in a collective negotiating agreement. It is undoubtedly important to the unions. Presumably it is also important to the Legislature. We recognize that the statute overturned our prior ruling that compulsory agency fees for all employees in the public sector were prohibited by another statute that protects the public employ-

ees' right to participate or refrain from participating in union activities. *N.J.S.A.* 34:13A–5.3, *construed in New Jersey Turnpike Employees' Union v. New Jersey Turnpike Auth.*, 64 *N.J.* 579, 319 *A.*2d 224 (1974); *N.J.S.A.* 34:13A–5.5 to –5.9 (requiring negotiation of agency fees). That an agency fee system for all public employees was important to the Legislature, however, does not quantify the legislative interest in its application to the judiciary. Nor does it purport to address or measure its potential impact on the administration of the court system when applied to judicial labor relations at this time.

Local 1044's position is that the policy is good for other public employees and nothing distinguishes judicial employees when it comes to an agency fee that makes it bad for the judiciary. Further, in response to the contention that the developing nature of labor relations in the judiciary is cause for caution in accepting any new policy, it notes that this is simply one more term in a collective bargaining agreement, and the judiciary seems to be perfectly capable of negotiating many others. Since our reluctance to follow the legislatively mandated policy stems not from any disagreement with it, we need not deal with issues involving the extent of our constitutional responsibility to adopt policies for the judiciary that may sometimes differ from legislation. Our position on agency fees results not from our disagreement but from our caution arising from the newness and complexity of judicial labor relations.

Measured against the private sector, public employment labor relations are relatively new and perhaps in some respects unsettled. Judicial labor relations are even more a new breed. As a practical matter, the phenomenon did not exist until very recently. The only exception is in the area of probation where, as evidenced by statute, the judiciary has been negotiating with probation officers since at least 1900. *L.* 1900, *c.* 102, § 6. Other than that, however, and until the 1980s, those who worked for the judiciary were, for better or worse, included with other public employees covered by their collective negotiat-

ing agreements. No public interest in conflict with that practice was perceived.

In 1980 the Chief Justice appointed the Committee on Efficiency in the Operation of the Courts. It consisted of persons from a broad spectrum of government, business, and the judiciary. In its report, it concluded that the most debilitating aspect of the present judicial management system was the judiciary's lack of control over its own personnel. It recommended, among other things, that judicial employees not be included in mixed collective negotiating units, that the judiciary negotiate only with organizations composed exclusively of judicial employees, and that labor relations in the judiciary move in the direction of statewide negotiating units, as distinguished from the then—and now—prevalent model of vicinage-wide units.

While control over court-support personnel was one of many major subjects dealt with by the Committee on Efficiency, judicial labor relations as such was not. A Task Force on that subject was therefore appointed in 1980, chaired by Judge John Ard, and composed of highly qualified members from both labor and management in the public sector, along with members of the judiciary. One of the subjects considered by that Task Force was the question of agency fees. Prior to that time, the Chief Justice had been advised by the judiciary's labor consultant that the judiciary should not negotiate agency fees, and that policy constituted the status quo for the judiciary pending further study.

The Task Force "[a]fter extensive debate ... remained sharply divided on the issue." Report at 55. It concluded that

the question of whether the agency shop should be negotiable is a fundamental policy question concerning which it can do no more than present the relevant considerations. However, the Task Force notes that approval of the negotiability of agency shop clauses while judicial employees are still organized in county-based units may make the realization of Statewide units more difficult, by giving the local representatives an economic stake in retaining county organizations. Some members suggest that, if the Supreme Court accepts the

■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■

agency shop concept as acceptable, the Justices may wish to authorize its negotiation only when negotiating with Statewide units. [*Id.* at 61.]

At the time of the Task Force's Report, 1983, the agency fee statute had only recently been passed, and collective negotiating agreements in the executive branch containing agency fee provisions had been subject to but little experience. It was clear that to some extent the Task Force was concerned about the newness of the subject. Furthermore, while held constitutional by Federal courts, *Robinson v. New Jersey,* 741 *F.*2d 598 (3d Cir.1984), *cert.* denied, 469 *U.S.* 1228, 105 *S.Ct.* 1228, 84 *L.Ed.*2d 366 (1985), the issue had not yet been determined under New Jersey law.

After further experience with agency fees and further developments, the Task Force was again asked to deal with some of the issues on which it had previously divided. Again, with highly qualified members from both labor and management along with representatives of the judiciary, the Task Force, chaired by former Attorney General James R. Zazzali, reporting in June 1988, "remain[ed] divided on the issue, a majority of the Task Force [ ] in favor of agency shop." Report at 5. The Report stated: "In any event, if the Court decides to negotiate agency fee in the Judiciary, *the entire Task Force* recommends that it should be authorized only when negotiating with statewide units." *Ibid.* (emphasis supplied). It further noted that "[u]nder any circumstances, agency fee should never be negotiated in mixed negotiations units which include judicial and non-judicial employees." *Ibid.* After noting that many of the issues that concerned the Task Force in 1983 had been resolved, eliminating some of the objections to agency fee provisions in collective negotiating agreements, the recommendation of the Task Force in 1988 was as follows:

A majority of the Task Force recommends that the Judiciary negotiate agency shop. The entire Task Force suggests that, if the Court approves the negotiation of agency fee, it be authorized only for statewide units. [*Id.* at 8–9.]

The issue, thus, is not at all simple. It is affected by a mix of policy considerations involving the status and structure of employee representative organizations, the short and long-term

goals of collective negotiations, and the relationship between such organizations and goals. Local 1044's suit demonstrates this complexity. It is not a statewide unit. It represents employees at the vicinage level only. Furthermore, it was, at the time of this contract, a mixed unit.

Obvious reservations about the agency-fee policy as applied to the judiciary, noted in *In re Judges of Passaic County*, 100 *N.J.* 352, 364, 495 *A.*2d 848 (1985) (*Passaic II*), appear in the conflict among the experts who have advised the Chief Justice, some favoring the negotiation of the issue, some opposing; and, in the context of this case, those reservations arise from the conclusion of these experts that agency fee should *not* be negotiated with a labor organization that is vicinage-wide (a conclusion mentioned without dissent by the first Task Force and unanimously agreed to by the second) nor with a labor organization that includes both judiciary and non-judiciary public employees (the unanimous conclusion of the second Task Force)—both characteristic of Local 1044.

The root of these divisions of opinion and this uncertainty is the heretofore referred-to complexity and newness of judicial labor relations. It has been only since 1980 that there has been any effort to separate judicial employees from others and to negotiate only with them. One mark of the newness of the policy is that only recently has there been agreement even on who is a judicial employee. *See Passaic II, supra,* 100 *N.J.* at 360–63, 495 *A.*2d 848. Despite the contrary direction suggested by every group that has recently studied the issue, some negotiating units are still mixed and the overwhelming majority are vicinage based. There is only one statewide unit representing judiciary employees, the Certified Shorthand Reporters Association. Two units are neither statewide nor vicinage based (the CWA's unit of Administrative and Clerical Service Employees and its unit of Supervisors (consisting of some employees of the Administrative Office of the Courts and of the various Clerks' Offices)), the covered employees being employed by the State and located in Trenton. The balance,

sixty-six units, are county or vicinage-wide. Of those sixty-six, fifty-eight consist exclusively of judiciary personnel: thirty-four are units of probation officers and/or supervisors, four are probation investigator units, six units consist of court clerks, and fourteen are made up of administrative or clerical support staff. The remaining eight are mixed units in eight counties, units that include both judicial and non-judicial employees.

This patchwork is simply the product of a history of a statewide judiciary superimposed on a structure for centuries supported and controlled by counties. Not only are units county-wide and mixed, even the control over judicial employees remains a subject of controversy. The county has its claim, both historic—it has always controlled the court-support staff, at least until most recently—and economic—it has always paid for them. Control is further diffused through specific offices or officers—Civil Service, Chief Probation Officers, Sheriffs, Surrogates, and County Clerks.

The newness and complexity of judicial labor relations is to some extent reflected in the history of the assistance provided by the Administrative Office of the Courts (AOC). Until 1986, the AOC had nothing to do with labor relations at the vicinage level except concerning probation officers. Probation officers, part of the statewide judiciary but paid by the counties, had been organized for many years, and by statute the terms of their employment were set by the then-County Court Judges, now by the Assignment Judge after the merger of the County Courts into the Superior Court. *N.J.S.A.* 2A:168–8; *N.J. Const.* of 1947 art. XI, § VI; *R.* 1:34–4. For various reasons County Court Judges sought assistance in that negotiating role, and in 1969 the Administrative Director of the Courts appointed an Assistant Director for Probation within the AOC to serve as the negotiator with the probation officers' representatives for County Court Judges in the twenty-one counties. In 1970, however, that responsibility was terminated, and the County Court Judges, or court managers, resumed direct negotiations with probation officers' representatives. The on-again off-

again nature of judiciary labor relations continued when in 1975 responsibility was again given to the AOC, centralized with the Assistant Director for Probation, in order to assure uniformity in collective negotiating agreements.

Following the report of the Committee on Efficiency in 1982, recommending that judiciary employees at the vicinage level be included in collective negotiating units composed exclusively of such employees and that collective negotiating agreements with such units include standardized terms and conditions, a Labor Relations Unit was established in the AOC consisting of—then and now—two professional and two clerical employees. That occurred in 1983. Until 1986, however, that Unit dealt only with non-vicinage judiciary organizations, two of them represented by the CWA and one consisting of official court reporters represented by the Certified Shorthand Reporters Association. It continued, however, to represent Assignment Judges in their negotiations with probation officers' representatives. It was only in 1986 that the AOC, through the Labor Relations Unit, commenced direct negotiations of labor contracts on behalf of Assignment Judges for court-related employees, essentially all of the judicial-support personnel at the vicinage level. That representation is in effect only in Essex, Middlesex, Monmouth, and Passaic Counties along with some negotiating responsibility for several other collective negotiating units consisting of probation investigators and court clerks. In all of the other vicinages the sole function of the Labor Relations Unit is to provide technical assistance to the judiciary, while negotiations proceed between the county and the representatives of mixed collective negotiating units, namely, those that include both county employees and court-related employees.

The function of the Labor Relations Unit recalls one added complexity in this picture. That Unit provides assistance to the Attorney General's Office in its representation of the judiciary before the Public Employment Relations Commission (PERC). The fact is that while the judiciary has not acceded to PERC's jurisdiction, it has, as a matter of comity and sound labor

relations, often used or accepted the services of PERC, *e.g.,* where questions involving union representation and elections, unfair practice proceedings, and negotiation impasse proceedings are involved. *See Passaic II, supra,* 100 *N.J.* at 365–66, 495 *A.*2d 848 (the Court remanded the matter to PERC requesting findings that would help determine which employees should be characterized as court-support personnel for collective negotiating purposes). Thus, we have used the experience and expertise of PERC, yet we are not bound by its determinations. *Id.* at 366, 495 *A.*2d 848. We mention this merely to illustrate the intricacy of the issue before us.

One of the concerns of the Task Forces in recommending against negotiating agency fee with vicinage-wide units was related to the goal of reorganization on a statewide basis. Whatever the reason, however, it is clear that the complexity of both defining and effectuating policy in the labor relations field is substantial. Combined with the uncertainty of how best to accomplish the goals that have defined our policies in this area are uncertainties relating to legislation, particularly legislation that might result in the State assuming all of those costs of the judiciary now paid by the counties. That prospect, from time to time deemed probable, is thought by some to be the single most important factor in encouraging statewide negotiating units. But with or without such legislation, the evolution of judicial labor relations remains affected by uncertainty both in its development and in its timing. Great care and good judgment are required to assure success in effectuating our goals.

Despite uncertainties, progress has been made. As a result of both persuasion and persistence, and, most of all, as a result of their own desire to help improve the judiciary, Boards of Freeholders, County Clerks, Sheriffs, Unions, Civil Service, County Administrators, everyone involved with county government, have been more and more willing to recognize the legitimacy and good sense of judiciary responsibility and control over its own personnel. The number of units that include only judiciary employees is growing, the number of mixed units

diminishing; the number of vicinages where personnel, even though hired and fired by county officers, are effectively controlled on a day-to-day basis by the judiciary continues to increase. And even where units remain mixed, recognition of the judiciary's interest in the terms of the collective negotiating agreement is practically universal.

Whether those developments, undoubtedly known to the Task Force in 1988, have further progressed to the point of warranting reconsideration of the judiciary's present policy is difficult to say. Many of the arguments advanced by the opposing sides have little to do with these developments. The fact is that while the Task Forces included members clearly identified with organized labor, neither Local 1044 nor any other labor union, as such, has had the opportunity to address these issues on the merits and present their arguments and their replies to answering arguments. The Chief Justice has indicated to the Court, without suggesting any different outcome, that he believes it would be desirable to meet with the parties as well as with others for a complete discussion of the matter, including the Task Force reports, as well as to conduct such further review as he deems appropriate. The Court concurs in this assessment of the situation. We do not believe that our present policy is so clearly correct as to be beyond reexamination at this time.

■ In sum, we determine only that *Passaic I, supra,* 73 *N.J.* 247, 374 *A.*2d 449, does not *compel* this Court to exercise its constitutionally mandated exclusive power over the administration of the courts of this state in some particular way in this case. *Passaic I* sets forth and explains the Court's rule concerning the appropriate exercise of that power when it conflicts with legislation. Administrative action, rather than litigation, will ordinarily be the means of revising or reversing the Court's exercise of that power, given the quasi-legislative discretion conferred on the Court when acting in its constitutionally allotted field. The Court remains open, as in this case, to any application addressed to our sound discretion to revise or re-

verse *any* administrative decision, and in connection with the resolution of such application the policies expressed in *Passaic II* concerning comity will obviously be of considerable importance.

One further matter should be addressed concerning this case. Ordinarily, this Court would not express its own views concerning any aspect of labor relations in a judicial opinion. Those views would be irrelevant, the question usually being one of the Legislature's intent or of public policy as suggested by various referents. The underlying issue here, however, will ultimately be resolved by the exercise of the Chief Justice's or the Court's power over the administration of the judicial system, and therefore, while legislative intent is important because of the considerations of comity mentioned above, the Court's own views on the matter before it, this relatively narrow point of judicial labor relations, the agency fee, may become critical. This Court has no bias whatsoever, either as a matter of economic philosophy, labor relations policy, or individual liberty, against agency fees. Whether agency fees are desirable *now* in conjunction with judicial labor relations, and if so, whether desirable in all collective negotiating agreements, is the question. It is that question that will be involved in the reexamination of this matter.

### III.

Although we defer decision of the constitutional questions raised by CWA, we note the probable analysis that would be applied in response to its equal protection argument. Labor relations in the judiciary in New Jersey today may be different from those of the executive. The executive's collective bargaining units are not predominantly organized on a county-wide basis and paid for through county funds as are the judiciary's. The executive has no overriding policy goal of ultimately achieving statewide negotiating units: they already exist; it has no policy goal in conflict with an overwhelmingly predominant county-wide unit model. In short, labor relations in the

judiciary are distinctive, indeed unique. Whether these differences, under conventional equal protection analysis, justify the difference in treatment of employees on this issue is the ultimate constitutional question. That the differences exist, however, and that they are substantial differences, is undeniable.[1]

## IV.

The judgment of the trial court is affirmed. We retain jurisdiction subject to the limitations set forth in *supra* at 497–498, 572 *A*.2d at 614.

HANDLER, Justice, concurring.

The relief ultimately sought by appellant is the right to include as a subject of negotiation on behalf of its member-em-

---

[1]The equal protection constitutional question before us is limited to the State Constitution, plaintiff having reserved the federal constitutional question for subsequent disposition by the Federal District Court. When the State Constitution alone is involved, considerations different from the parallel federal question may be dispositive. We refer here primarily to the grant, in the same State Constitution that is the source of the equal protection question before us, of this Court's exclusive power over the administration of the state court system. Comity concerns have ordinarily persuaded us to conform our rules concerning that administration to statutory law applicable to the executive. But when we conclude that sound judicial administration calls for a policy or rule different from the statute, our power to promulgate such a policy or rule has been unquestioned.

Plaintiff's state equal protection claim suggests that this Court must prove that the judiciary's situation is different from that of the executive: that, in addition to explaining our policy preference over that of the executive, we are constitutionally bound further to justify the difference, thereby, in effect, according a constitutional preference to the executive policy over ours, a preference that is restrictive of our own power. We may, of course, achieve the same result as a matter of comity, but that would be our choice, not a state constitutional equal protection mandate.

We leave to others the implications of these observations for federal equal protection purposes. See *White v. Superior Court In & For County of Pima,* 25 *Ariz.App.* 438, 544 *P.*2d 262 (1975) (fired judicial employee's federal equal protection claim of right to same hearing granted other state employees rejected based on conventional equal protection analysis and on grounds of separation of powers—"judiciary [must] be permitted to administer its own personnel").

ployees an agency-fee arrangement as a term and condition of employment with the Judiciary. The Court makes clear in its opinion that this question—whether an agency-fee arrangement should be a negotiable term and condition for judiciary employees—is currently under consideration by the Chief Justice. It is anticipated that it will be the subject of a determination and action by the Chief Justice. It is evident that such an administrative disposition obviates a meritorious judicial disposition of the legal issues and claims brought by plaintiffs in this action. The Court, therefore, soundly "defer[s] decision of the constitutional questions raised by CWA." *Ante* at 510, 572 *A*.2d at 620.

Nevertheless, the Court engages "in the probable analysis" of such constitutional issues. *Ante* at 510–511, 572 *A*.2d at 620–621. However, it is not imperative that we foreshadow any particular analytical approach to a treatment of constitutional issues, especially when consideration of such issues can be held in abeyance because they may not ripen into a genuine controversy. It may also be a better exercise of discretion not to engage in such a discussion of constitutional doctrine lest it be misconstrued as a reflection of the Judiciary's labor-relations attitude. It assuredly is not so intended. Thus, despite its characterization, I do not construe the Court's "analysis" as a description or delineation of relevant and operative constitutional standards or tests. The Court's reference to constitutional concerns should be understood, I respectfully suggest, as no more than an indication of the degree of novelty or complexity that may attend any determination of constitutional issues in this case in the event constitutional adjudication becomes necessary.

*For affirmance*—Chief Justice WILENTZ and Justices CLIFFORD, HANDLER, POLLOCK, O'HERN, GARIBALDI and STEIN—7.

*Opposed*—None.