IN THE MATTER OF JUDGES OF PASSAIC COUNTY, PUBLIC-EM-PLOYER-RESPONDENT, AND LOCAL 153, OFFICE AND PRO-FESSIONAL EMPLOYEES INTERNATIONAL UNION, PETI-TIONER, AND COUNCIL # 3, NEW JERSEY CIVIL SERVICE ASSOCIATION, AND PASSAIC COUNTY CLERKS ASSOCIA-TION, INTERVENORS, AND COUNTY OF PASSAIC, PARTY-AT-INTEREST-APPELLANT.

Argued October 11, 1983—Decided July 29, 1985.

*Michael H. Glovin,* Assistant County Counsel, argued the cause for appellant (*Martin Verp,* Passaic County Counsel, attorney).

*Michael L. Diller,* Deputy Attorney General, argued the cause for respondent (*Irwin I. Kimmelman,* Attorney General of New Jersey, attorney; *James J. Ciancia,* Assistant Attorney General, of counsel).

*Robert E. Anderson, Jr.*, General Counsel, submitted a statement in lieu of brief on behalf of the Public Employment Relations Commission.

PER CURIAM.

This appeal concerns the proper procedure for determining who is a judicial employee for the purpose of resolving issues of representation in public employment. We agree with the Public Employment Relations Commission that it lacked the jurisdiction to make a final resolution of that issue in the circumstances of this case. We believe, however, that Passaic County is entitled to a hearing on its contentions that the subject employees are not judicial employees, and hence, as a matter of comity, we remand the cause to the Commission for a factual recommendation on that issue.

I.

The dispute began in February 1981 when a petition for certification of public employee representation was submitted to the Public Employment Relations Commission (PERC) by Local 153, Office and Professional Employees International Union, with respect to a proposed bargaining unit to be composed of certain clerical employees at the Passaic County Court House. Subsequently, an amended petition was filed expanding the petition or unit to include "[a]ll clerical employees assigned to Register, Surrogate, Juvenile and Domestic Relations Court, District Court, Probation, and County Clerk of the County of Passaic." PERC accepted the amended petition on March 10, 1981.

As a consequence of the petition, PERC's Director of Representation convened a conference on May 5, 1981 at which an agreement for a consent election was reached. A representative of the Assignment Judge of Passaic County designated 296 employees as appropriate for the judicial unit. A representative of the County of Passaic signed the consent agreement.

Following the execution of the consent agreement, the County of Passaic sought to withdraw its consent, contending that it was under the impression that the County of Passaic was to be designated as the employer of the unit for collective bargaining purposes. It contended that it, and not the judiciary, had the right to negotiate with judicial clerical employees in monetary matters. The County then requested a stay of the consent election until the matter of who was to be considered the employer of the unit was determined. Subsequently, the County of Passaic admitted that 65 of the 296 listed employees were appropriately to be considered judicial employees because they had been appointed to their positions by the Assignment Judge of Passaic County pursuant to Rule 1:33–4(e); but the County objected to the remainder of them being considered judiciary employees because, for the most part, they had been hired through Civil Service and did what the County described as "routine functions pursuant to their job descriptions." The Director of Representation then invited all parties to submit materials on the issue of who should be designated as the employer. The County requested a hearing to adjudicate its claim that it was the employer of the disputed employees. PERC's Director of Representation decided that "in the absence of [contrary] presentation by the County, [the judiciary] exercises substantial control over the labor relations affecting the employees in question," and therefore dismissed the objection to the consent agreement for a representation election. Following further submissions, PERC decided to grant the County's request for reconsideration and again allowed the parties to submit further position papers. Each side then did so.

The Commission, at its meeting of March 9, 1982, rendered a decision that affirmed the Director's denial of the County's objection to the agreement for a consent election, but based its determination not on the fact that the judiciary was the employer of the disputed employees, but on the grounds that the Commission did not have the authority to consider the claims of the County relative to the judiciary. Its decision went on to

state that while it was without the authority to adjudicate the County's claim contesting the judiciary's assertion that it is the public employer of the employees in question, it would afford the judiciary the use of its representation mechanisms. The County contended that there was an essential unfairness in the Commission stating that it did not have jurisdiction to hear the County's objection to the status of affected employees while nonetheless accommodating the claims of the judiciary without affording the County the right to challenge any of the judiciary's factual assertions.

The County of Passaic filed a notice of appeal with the Appellate Division. We directly certified the cause, 93 *N.J.* 285 (1983), and stayed the representation proceedings. While the outlines of resolution of the jurisdictional issue emerge in some detail from our prior precedent, the underlying and more fundamental issues of the proper accommodation of judicial labor relations with the competing concerns of county government raise matters of broad import that we must continue to address.

## I.

The *Final Report of the Supreme Court Committee on Efficiency in the Operation of the Courts of New Jersey* (1982) (hereinafter referred to as the *Efficiency Report*) identified, as a critical element impeding the quest for an efficient court system, the lack of a clearly defined personnel management system for New Jersey's judiciary. The report found as follows:

> The Committee on Efficiency has concluded that the most significant obstacle to effective management, and thus to the efficient functioning of the courts, is the absence of centralized control over employees. Presently, control is divided among trial court officials, Department of Civil Service, unions which represent court support employees, and counties. Each group plays a role in determining terms and conditions of employment and how work is to be performed. Thus, the lines of authority over trial court employees are intertwined and often in conflict. While Assignment Judges have responsibility for the efficient functioning of the courts, they lack authority and control over employees. [*Efficiency Report* at 37.]

This case is but an illustration of the complexities of judicial management structure outlined in that report. Key recommendations of the *Efficiency Report* include the strengthening of the position of the assignment judge by providing a clear definition of the management responsibilities at the trial level and defining a strong supervisory role for the assignment judge with respect to the performance of court-related functions of the County Clerk's office. *Id.* at 104–05. To effectuate these goals the *Efficiency Report* urged, among other things, that the court should create trial court system employee negotiating units in those cases in which these judicial employees are among other unionized employees unrelated to the courts. *Id.* at 113. The purpose was stated to be to negotiate with unions that represent court system-related employees so that the special needs of trial court system employment can be accommodated. The report concluded that "[t]he single most important finding of the Committee on Efficiency is that people, whose costs are the predominant portion of Trial Court System costs, are not being managed effectively from a systemwide viewpoint." *Id.* at 116.

In implementing the basic management issues outlined in the *Efficiency Report,* we have identified but not resolved the extremely subtle and complex problems involved in organizing a system of judicial personnel management and labor relations. The 1982 Report to the Judicial Conference on Probation, Strategies for the Future: A Blueprint for Change (June 25, 1982) included in its recommendations a commentary that "[t]he Judiciary needs to gain control over both its administrative functions and its personnel if it is to assure that whatever policies and operational standards emerge from its mission and goals are in fact implemented effectively," *id.* at 57 (citing *New Jersey Probation Services: Final Report,* National Center for State Courts, p. 81).

The Report of the State Family Court Committee to the June 24, 1983 Judicial Conference noted that "the Committee on Efficiency in the Operation of the Courts (the Van Fossan

Committee) in its report recommended that trial court clerical support functions be consolidated under the direct control of the Judicial Branch." *Id.* at 38. The State Family Court Committee endorsed those recommendations, but, recognizing that other Supreme Court committees were considering proposals with respect to court management structure and staffing, deferred to those committees on those issues. *Id.*

The "Final Report of the Management Structure Committee" (1983), appointed to implement the recommendations of the *Efficiency Report,* recommended changes in court rules that would implement those major recommendations.[1] In particular:

> [T]he responsibilities of the Assignment Judge will include a specification that he supervise the Judiciary within the vicinage and be responsible for its performance. It is his duty to ensure the efficient and economic operation of the courts, a duty which, while always assumed, has not been explicitly stated. He is also responsible for the disposition of cases and the allocation of judges.
>
> Most importantly, the Assignment Judge is vested with clear authority over judicial support personnel, their appointment and allocation. This explicit grant of authority does not vest the Assignment Judge with additional authority. Rather, it asserts an authority which is a necessary component of the constitutional responsibility of the Chief Justice for the administration of justice and one which is delegated by him to the Assignment Judge. *Simply stated, if the Assignment Judge is responsible for managing the courts in his vicinage, he must be able to manage the personnel employed by the court system.* ["Final

---

[1]The new trial court management structure reflects more accurately the character of judicial activity. Each vicinage is supervised by an Assignment Judge, designated by the Chief Justice, who is responsible for the performance of all court and court support personnel in the vicinage. The Assignment Judge is aided by a professional administrator, with expertise in such areas as budget and personnel management. Case management assumes increased importance with designation of the Trial Court Administrator as Case Coordinator with authorization to transfer resources among the court support offices to meet fluctuating case processing needs. Under the system, there are four managerial divisions—civil, criminal, family and chancery. Each is supervised on a vicinage basis by a Presiding Judge responsible for the movement of cases within that unit. The judge is assisted by a professional administrator, the case manager, who coordinates the operations of the numerous court support units within the division. Probation services, while maintaining its present identity and functions, is more closely integrated with the courts to facilitate the day to day movement of cases.

Report of the Management Structure Committee," *N.J.Law Journal* (Aug. 4, 1983) at p. 3 (emphasis added).]

Hence, it has been made clear under Rule 1:33–4 that the Assignment Judge has full responsibility for the administration of all court units within the vicinage, including those of the surrogate and the deputy clerk of the Superior Court.[2]

Nothing contained in these reports, however, fully resolves the fundamental question of who shall be considered court support personnel for purposes of collective negotiations. That is the precise question that was before PERC in this case.

The proper accommodation of these competing interests in judicial labor relations presents varied and difficult problems that we must continue to address. For although the question may be phrased in terms of the duties involved, there are competing concerns that must be recognized. As we have sought to address these problems, County Freeholder Boards, County Executives and Administrators, County Clerks, Sheriffs and Surrogates have worked with us to achieve our mutual goals of a fair and efficient judicial system. We have each come to understand better the problems and needs of the other. These exchanges have helped us to recognize their conflicting fiscal and management restraints and we have worked together to resolve them. By way of example, we have established a County-Judiciary Liaison Committee to meet on a regular basis with county officials and constitutional officers. In addition, the Administrative Director of the Courts has worked closely with County Clerks through the Court's County Clerk Liaison Committee, chaired by Justice Pollock, to resolve many similar personnel issues through understanding and agreement.[3]

---

[2]By a 1978 constitutional amendment, County Clerks became clerks of the Law Division of the Superior Court and Surrogates became clerks of the Chancery Division (Probate Part) of the Superior Court for their respective counties.

[3]The Minority Report by County Clerks as Clerks of Court, appended to the *Efficiency Report,* outlined some of those competing concerns. The County

For all these reasons, we have approached the resolution of the underlying issues with grave concern and perhaps too deliberate speed. But the parties to this controversy need not await the outcome of these larger issues.

II.

The controversy in this case comes down to whether PERC has jurisdiction under the New Jersey Employer-Employee Relations Act, *N.J.S.A.* 34:13A–1 to –21 (the Act), to resolve the question of whether the subject personnel are judicial employees. That question has been largely foreclosed by *Passaic County Probation Officers' Ass'n v. County of Passaic,* 73 *N.J.* 247 (1977). We there held that a court directive that would coordinate the working hours of probation employees with the trial court schedule was not a proper subject for collective negotiations. We emphasized the preemptive responsibility of the court "for seeing that the judicial system functioned effectively in the public interest." *Passaic County Probation Officers, supra,* 73 *N.J.* at 252 (quoting Chief Justice Vanderbilt in *Winberry v. Salisbury,* 5 *N.J.* 240, 244, *cert.* den., 340 *U.S.* 877, 71 *S.Ct.* 123, 95 *L.Ed.* 638 (1950)). In the context of probation officers' work schedules, we held that the statutory arrangements under the New Jersey Employer-Employees Relations Act could not have precedence over directives of the Court, promulgated pursuant to its constitutional obligation to insure a proper administration of the court system. We deal here with varied court-related employees, from interpreters and data processors to clerk typists and Sergeants-at-Arms. Although there are significant differences between their duties, among themselves, and those of probation officers, the focus will

---

Clerks point out that their office is not responsible for delays caused by various calendaring problems, by adjournments, or any of the other causes of calendar backlog. They emphasize that the office of the County Clerk is a constitutional office and that constitutional role must be respected.

remain the same, whether their performance affects the effective functioning of the judiciary.

Nonetheless, even in the context of *Passaic County Probation Officers, supra,* we emphasized the judiciary's desire to achieve maximum comity with all statutory arrangements for public employees not inconsistent with our constitutional function. 73 *N.J.* at 255. Accordingly, in this case the Passaic County Assignment Judge (as the Chief Justice's representative, *R.* 1:33–4(a)) concurred in the request expressed by a representative number of judicial employees that they be given the right to select a representative.[4] The Constitution includes the following relevant paragraph:

> Persons in private employment shall have the right to organize and bargain collectively. Persons in public employment shall have the right to organize, present to and make known to the State, or any of its political subdivisions or agencies, their grievances and proposals through representatives of their own choosing. [*N.J. Const.* (1947), art. I, para. 19.]

All agree that PERC is uniquely qualified to conduct a representation election to choose an organizational representative for such employees. Both the County and the judiciary have important interests in labor relations. The Passaic County Assignment Judge will have a vital interest in the conduct, through the court's proper representatives, of negotiations with court employees covering wages and other working conditions. Since *Passaic County Probation Officers, supra,* 73 *N.J.* 247 even though the provisions of the Public Employer-Employee Relations Act do not supersede our directives to judiciary employees, we have voluntarily applied some of its provisions to judicial employees. In addition, the judiciary has availed itself

[4]The caption of this case incorrectly refers to the Passaic County Judges as the employer. Under prior law, appointments to probation service were made by the county judges. *N.J.S.A.* 2A:168–5. Hence prior decisions referred to county judges as the judicial employer. *Passaic County Probation Officers, supra,* 73 *N.J.* 247. By the 1978 Constitutional Amendment, county judges became judges of the Superior Court. In addition, the employees in this case are not probation officers. Under current Court Rules, the Assignment Judge is the proper party to make such a decision. *R.* 1:33–4.

of PERC's resources to conduct elections to determine unit representation and to provide mediation and fact-finding services during impasses in collective negotiations. Hence the Assignment Judge of Passaic County gave consent to the representation election.

The County, on the other hand, also has a vital interest in the outcome of such negotiations. Under current law the trial court system depends on the State's twenty-one counties for necessary fiscal support. Over the years, as is the case now, county governments have manifested a genuine commitment to the proper funding of an effective court system. In addition to direct salary costs for almost all staff, they now provide almost all other support services at the county level, from the court house itself to the record-keeping facilities.[5] Hence their interests are genuine and deserve careful hearing.

Therefore, the concern in this case is not between labor and management but between managers. Both the judiciary and the county government seek to be recognized as the managers of the subject employees. That is a subtle and complex question involving the constitutional structure of government. Its final resolution has not been assigned to PERC; such assignment would tend to undermine the unquestioned confidence that employers and employees should have in PERC's exercise of its primary jurisdiction in resolving disputes between employees and employers. As noted, public employees in New Jersey have a constitutional right to organize and present "grievances and proposals [to public employers] through representatives of their own choosing." *N.J. Const.* (1947), art. I, para. 19. To "flesh out" these constitutional guarantees, *Lullo v. Intern. Assoc. of Firefighters,* 55 *N.J.* 409, 416 (1970), the

---

[5]In calendar 1984, county-level judicial budgets totalled $130 million, which includes salaries and operating expenses. Excluded from this total are expenses paid by the State (such as judicial salaries) as well as expenses paid from centrally-budgeted accounts in the counties (such as fringe benefits, overhead including utilities, and capital construction expenses).

Legislature, in 1968, enacted the New Jersey Employer-Employee Relations Act, *N.J.S.A.* 34:13A–1 to –21. That Act established the New Jersey Public Employment Relations Commission and gave it the authority to "make policy and establish rules and regulations concerning employer-employee relations in public employment relating to dispute settlement, grievance procedures and administration including enforcement of statutory provisions concerning representative elections and related matters * * *." *N.J.S.A.* 34:13A–5.2. The Act specifies that representatives selected by public employees shall be the exclusive representatives for collective negotiation concerning terms and conditions of employment. *N.J.S.A.* 34:13A–5.3. The Act also authorizes PERC to determine whether a matter is within the scope of collective negotiations, *N.J.S.A.* 34:13A–5.4d, and to regulate representation elections, *N.J.S.A.* 34:13A–5.4e.

PERC has concluded that those statutory missions do not encompass the resolution of competing claims to manage court support personnel. *In re County of Ocean,* PERC No. 78–49, 4 *NJPER* 92 (¶ 4042 1978), aff'd, 167 *N.J.Super.* 73 (App.Div. 1979).

> Since *Passaic County Probation Officers,* the Commission * * * [has] concluded that the Judiciary must be considered as a separate public employer, from a labor relations perspective, of employees within its regulatory control and superintendence [citation omitted]. Given the unique status of these employees, *vis-a-vis* the Employer-Employee Relations Act, the Commission has only asserted jurisdiction over disputes involving employees of the courts where it has been advised that the Judiciary acquiesces as a matter of comity to the submission of the matter to the Commission. [*In re State of New Jersey,* D.R. No. 81–34, 7 *NJPER* 209, 211 (¶ 12093 1981), req. for rev. den. P.E.R.C. No. 81–127, 7 *NJPER* 256 (¶ 12115 1981).]

We therefore believe that since the dispute is over competing claims of management, PERC correctly held that it lacked jurisdiction to resolve that issue.

III.

Having said that, we are not averse to the idea that the parties should have the maximum benefit of the expertise that PERC has obtained in the field of employment relations. If the

judiciary is to maintain the "full enjoyment of its paramount and exclusive powers over the judicial branch," *Knight v. Margate,* 86 *N.J.* 374, 390 (1981), it must exercise that power with great sensitivity, not necessarily sparingly, but with great sensitivity to permit or accommodate the lawful concerns of other branches of government. *Id.* at 391. Hence we would invite PERC to continue to perform, as its Director of Representation did here, a factfinding function in aid of the litigants. For although differing substantive standards may obtain in judicial labor relations (*e.g.*, as to who shall be considered supervisory or confidential employees, the scope of negotiations, unfair practices, or representation fees), PERC's general experience and expertise in such matters will provide a valuable adjunct to the several branches of government in working out a viable system of employer-employee relations.

In this case the County contends that it was denied an evidentiary hearing on the question of whether the subject employees were judicial employees. In its view, the employees were not necessary or integral to the proper administration of a trial court system. The Director of Representation concluded that the County's claims of employment based on hiring and payment of the subject employees was not dispositive. He relied upon other "traditional factors relating to indicia of employer status" manifested by the substantial control of the judiciary over the work activities of the disputed personnel and superintendence on a day-to-day basis. *See In re Bergen County Prosecutor,* PERC No. 78–77, 4 *NJPER* 220 (¶ 4110 1978), aff'd, 172 *N.J.Super.* 363 (App.Div.1980) (because of substantial control over work, prosecutor, rather than the county, was the employer of county detectives and investigators assigned to the prosecutor's office, despite county's claims of employer status, based upon its hiring and payment of detectives, and its fiscal control over the prosecutor's budget); *In re County of Ocean,* PERC No. 78–49, 4 *NJPER* 92 (¶ 4042 1978), aff'd, 167 *N.J.Super.* 73 (App.Div.1979) (despite absence of statutory grant of appointing authority regarding court clerks,

substantial control over their activities by the judiciary makes the employees an integral and necessary part of the judicial system). He further concluded here that the availability of Civil Service coverage through the county's personnel department and the designation of the county as the appointing authority for Civil Service purposes were insufficient factors to overcome the more significant and compelling factors of superintendence and control of the employees involved. As noted in the disposition that PERC made of the case, it did not have to resolve that question in view of its jurisdictional conclusion. While there is strong support for the Director of Representation's view that these employees were necessary for the performance of the judicial function,[6] we should not foreclose the County's opportunity to test that issue.

We have always stressed the quest for principles of law "designed to assure that a controversy, or its most critical facets, will be resolved by the forum or body which, on a comparative scale, is in the best position by virtue of its statutory status, administrative competence and regulatory expertise to adjudicate the matter." *Hinfey v. Matawan Regional Bd. of Educ.*, 77 *N.J.* 514, 532 (1978) (*quoted in Boss v. Rockland Elec. Co.*, 95 *N.J.* 33, 40 (1983)). As a matter of comity the judiciary should try to adjust its processes so that someone other than the judiciary will make the initial determination. PERC's expertise in analyzing traditional indicia of employment is of obvious value. Accordingly, we will remand the cause to enable PERC to undertake a factual review of the contentions of the County and the judiciary as to whether the subject employees are or should be considered part of the trial court support system for collective bargaining purposes. (See generally *Efficiency Report*, ch. 4, p. 28 for general discussion of the range of duties.) In addition, when we ultimately get the

---

[6] *See In re Salaries for Probation Officers of Bergen County 1970–1971*, 58 *N.J.* 422 (1971); *In re Salaries for Probation Officers of Hudson County 1976–1977*, 158 *N.J.Super.* 363, 366 (App.Div.1978).

record, we will have more facts before us—facts bearing not only on whether these are employees integrally involved with the judiciary, *Passaic Probation Officers, supra,* 73 *N.J.* at 252–53, but also on what the various advantages and disadvantages are, in a labor relations sense, in having these employees negotiate either with the County on the one hand or the judiciary on the other hand—perhaps regardless of their importance to the judiciary.

Our present management structure, *ante* at 358 contemplates a blending of all court support personnel, whether Rule 1:33, probation or county clerk's, in a coherent management system under the vicinage assignment judges. Presumptively then, given the assignment judge's position here, and the descriptions of the employees' functions in the record, these employees are part of judicial management. Still, it may turn out upon presentation of additional facts and circumstances that we will conclude that it would not be conducive to sound labor-relations policy or sound judicial management that the judiciary be recognized as the public employer of certain of these employees *for purposes of collective negotiations.* Our mutual goals may be better served by an advisory relationship, or perhaps a joint responsibility, in the negotiations without adverse impact on our ability to manage the court system. Although PERC's factual findings on the relations of these employees to the judiciary and their importance to the judicial functions, in this context of collective negotiations, will not be binding on us, these findings will be given appropriate weight in our determination. Frequently such non-binding factfinding will entirely resolve a dispute between parties. *See Teaneck Bd. of Educ. v. Teaneck Teachers Ass'n,* 94 *N.J.* 9, 19, n. 4 (1983); L. Bierman, "Factfinding: Finding the Public Interest," 9 *Rut.-Cam.L.J.* 667, 677 (1978). There are other avenues of resolution of such a controversy, including the creation of a special factfinding panel (as has been done to resolve budgetary disputes under Rule 1:33–9), or a standing commission. Each solution expresses the goal of assuring a fair hearing.

In this case we believe the appropriate solution is to ask, as a matter of comity, that PERC address the factual issues raised by the County. In this way the competing concerns of the judiciary and the County will be afforded a hearing before as detached and impartial a panel as can be provided. Should experience indicate that we are unable satisfactorily to administer our own affairs in this way, we may be obliged to reconsider this form of resolution. However, our goal remains one of resolving these management relations in the spirit of comity that has marked our relations with other branches of government.[7]

In any case, whether after a hearing before PERC or a separate panel, we would be obliged to exercise our constitutional responsibility of review to assure that the judicial system functions effectively in the public interest. For the fact remains that the judiciary cannot yield its ultimate power to decide with finality controversies involving its authority. When we upheld the constitutionality of the application of statutory ethical restrictions to members of the judiciary, we did so because the legislation did "not interfere with the Supreme Court's administration of the court system and regulation of the judiciary and legal profession." *Knight v. Margate, supra,*

[7]To that end, the Chief Justice has created a Judicial Labor Relations Task Force chaired by Judge Ard. That committee was charged to develop recommendations for a comprehensive judicial labor relations policy. We shall shortly share the Task Force's recommendations with the affected agencies of government. In particular, we will address cooperative approaches with county government that will assure participation by freeholders and executives in the fiscal aspect of judicial labor relations, coordination of our fiscal years, evaluation of "Cap Law" concerns under *N.J.S.A.* 40A:4–45.4, and a revised structure for review proceedings to resolve differences between the county and the judiciary at an early stage. Our present court support system is the product of centuries of legal and governmental change. The constitutional amendments of 1978 and 1983 merged all county courts into the statewide Superior Court but left essentially in place the mosaic support systems of those county courts. Resolving our new relationships will not be accomplished in a single opinion. As we stated at the outset, we must continue to address these problems.

86 *N.J.* at 395; *see also Greenberg v. Kimmelman,* 99 *N.J.* 552, 558 (1985) (the New Jersey Conflicts of Interest Law, *N.J.S.A.* 52:13D–11, may be applied to the wife of a Superior Court judge).

The cause is remanded to PERC to entertain the request for a factual hearing made by the County. We retain jurisdiction so that we may review the findings and recommendations of PERC as to who should be recognized as the public employer of the employees for purposes of collective negotiations. In the meantime, the interests of the public employees in the selection of the representative of their choice should not be delayed. The stay of the judgment is dissolved. A representation election may proceed. It may be necessary to consider whether other employee associations should be on the ballot. The ultimate questions of management control shall be resolved in these further proceedings.

*For remandment* —Chief Justice WILENTZ, and Justices CLIFFORD, HANDLER, POLLOCK, O'HERN and GARIBAL-DI—6.

*Opposed* —None.