903 A.2d 1079 (2006)
387 N.J. Super. 279
Michelle THURBER, Plaintiff-Respondent/Cross-Appellant.
v.
CITY OF BURLINGTON, Defendant-Appellant/Cross-Respondent, and
State of New Jersey Judiciary, and the Hon. John A. Sweeney, A.J.S.C., Defendants-Intervenors.
Superior Court of New Jersey, Appellate Division.
Submitted May 15, 2006.
Decided August 3, 2006.
*1081 Cureton Caplan, Mt. Laurel, attorneys for appellant/cross-respondent (Karen M. Murray and Anthony Valenti, of counsel).
Weissman & Mintz, Somerset, attorneys for respondent/cross-appellant (Steven P. Weissman, on the brief).
Ballard, Spahr, Andrews & Ingersoll, Voorhees, attorneys for intervenors (Steven W. Suflas and Aisha M. Barbour, on the brief).
Zulima V. Farber, Attorney General, for the New Jersey Merit System Board (Pamela N. Ullman, Deputy Attorney General, on the brief).
Before Judges C.S. FISHER, YANNOTTI and C.L. MINIMAN.
The opinion of the court was delivered by
FISHER, J.A.D.
In this appeal, we reject the argument of the Judiciary and the argument of plaintiff's employer, the City of Burlington (City), that it was the assignment judge of the vicinage and not the Merit Systems Board which should have determined whether or to what extent plaintiff, a deputy municipal court administrator, should be disciplined as a result of circumstances surrounding her encounter with police officers in 2000. Having so resolved this jurisdictional dispute, we affirm the Merit System Board's determination that plaintiff engaged in unbecoming conduct and that a six-month suspensionand not termination as directed by the assignment judge and sought by the Citywas an appropriate sanction.

I
Michelle Thurber (plaintiff) had been employed by the City as a deputy municipal court administrator for approximately ten years when she was stopped by Officer Larry Robb in Cherry Hill at approximately 2:00 a.m. on September 16, 2000. The record indicates that plaintiff either made or received cell phone calls while the officer was attempting to talk with her. She said during this encounter that she suffered from anxiety or panic attacks and, as Officer Robb and Officer Timothy Tedesco attempted to handcuff her, plaintiff indeed began screaming and pulling away. Once handcuffed and in the back of the police vehicle, plaintiff kicked out a side window and attempted to escape through the broken window. She eventually calmed down. Plaintiff was taken to the police station, where two breathalyzer *1082 tests indicated she had a blood alcohol content of 0.10 and 0.11. She was charged with speeding, driving while under the influence, criminal mischief and resisting arrest.
The following Monday, plaintiff met with the City's administrator, who later circulated a memorandum that indicated he told plaintiff that he "consider[ed] such behavior both serious and . . . unacceptable," and that the City would make available counseling and substance abuse programs as she might require. No other action regarding plaintiff's employment status was then taken.
On October 10, 2000, however, the assignment judge wrote to the City's mayor and council, stating in part:
As you are undoubtedly aware, Ms. Thurber has been charged with numerous offenses by the Cherry Hill Police on September 16, 2000. As a result, and being fully cognizant of her presumption of innocence, I am exercising my authority as Assignment Judge of Burlington County pursuant to Rule 1:33-4 to temporarily remove her from the Municipal Court in Burlington City, effective immediately.
I leave to your sound discretion and good judgment whether to suspend her with or without pay, or to employ her in another capacity.
The mayor wrote to plaintiff on October 12, 2000, acknowledging receipt of the assignment judge's letter and indicating that:
The City . . . shares the concern as expressed by [the assignment judge]. Until the charges have been disposed, your employment with the City . . . is suspended, with pay, effective immediately. Once the charges have been disposed, a final decision regarding your employment will be made.
On January 17, 2001, plaintiff pled guilty to reckless driving, which resulted in a 120-day suspension of her driving privileges, and also to disturbing the peace in violation of a Cherry Hill ordinance, which resulted in a $1,000 fine. Although not clearly disclosed by the record, we assume that the driving while intoxicated, resisting arrest and criminal mischief charges were then dismissed.
The next day, the assignment judge was advised of the outcome of the charges and, as a result, he sua sponte entered an order on January 23, 2001, which required plaintiff to show cause on February 20, 2001 why "she should not be permanently removed from the position as Deputy Court Administrator." Plaintiff's attorney immediately responded, seeking written notice of the specific administrative charge to which plaintiff was to respond, citing Nicoletta v. No. Jersey District Water Supply Comm'n, 77 N.J. 145, 163, 390 A.2d 90 (1978) (holding that "the first prerequisite of due process is fair notice, so that a response can be prepared and the respondent fairly heard"). A few days later, the assignment judge wrote to the city solicitor to advise that he was "withdrawing, for the time being, my order to show cause"; the judge, however, gave the City further direction regarding plaintiff's employment status:
Inasmuch as Ms. Thurber is protected by a contract of employment, I am directing you as [city] solicitor . . . to inform the Mayor and Council to take disciplinary action against her as [a] result of the municipal court charges in Cherry Hill Township. The Council is to appoint a hearing officer who may not be a Municipal Court Judge to hear the charges against her and to render written findings and conclusion. Thereafter, based upon the facts which have been established at a hearing, I will renew my order to show cause.
In response to this direction, the City issued a preliminary notice of disciplinary *1083 action, charging plaintiff with "conduct unbecoming a public employee" as a result of the September 16, 2000 events "which led to [her] conviction of offenses in the Cherry Hill municipal court." This unbecoming conduct was described in the notice as including: her "refusal to perform field sobriety tests as directed"; her making and receiving of cell phone calls while the Cherry Hill officer was attempting to conduct an investigation; her refusal to be handcuffed and her struggle with the Cherry Hill officers after being informed she was under arrest; her resistance after being placed in the patrol car; her damaging a police car by kicking out a rear passenger window; and her attempt to escape from custody through the broken window.
The City appointed an attorney (the hearing officer) to conduct a hearing into these accusations. The record does not indicate whether plaintiff had any input into the selection of the hearing officer. At this proceeding, the hearing officer received the testimony of the Cherry Hill police officers regarding the September 16, 2000 events. Plaintiff chose not to present any evidence except for an expert report written by Dr. Roberta Ball, which was provided along with her attorney's written summation, and which indicated that plaintiff suffered from panic attacks of a nature similar to what occurred when she was arrested on September 16, 2000. In the words of her attorney, this medical evidence was "not offered in mitigation of the events testified to by the officers . . . [but] rather, it is offered as substantial evidence of the precipitating cause of her actions on September 16, [2000], and points to the complete absence of any voluntary misconduct."
In his May 8, 2001 written findings, the hearing officer concluded, as was undisputed, that plaintiff engaged in the conduct described by the officers, and, in addition, found plaintiff's expert to be unreliable and the expert opinion as having no bearing on the circumstances alleged. He recommended that, as a result, plaintiff's "employment with the City . . . be terminated and specifically that her employment as the Deputy Court Administrator . . . be terminated."
The next day, May 9, 2001, the assignment judge wrote to advise the City that he had reviewed the hearing officer's "reasoning very carefully" and concluded that it was "sound." It is not clear to us whether the assignment judge had access to a transcript of the testimony taken by the hearing officer, the written submissions provided by the parties to the hearing officer or plaintiff's expert report. We assume that the parties had no opportunity to argue to the assignment judge regarding the merits of the hearing officer's decision, or the process that generated it, because the assignment judge rendered his decision the day after the hearing officer issued his findings. As a result of his view of the "soundness" of the hearing officer's findings, the assignment judge "directed" the City to terminate plaintiff "from her position as Deputy Court Administrator." The judge further advised that his decision was made "independently in my capacity as Assignment Judge and is not intended to influence or affect any decision of yours as a public employer pursuant to the Civil Service laws of this State."
On May 9, 2001, the City's mayor wrote to plaintiff to notify her that effective the close of business on May 14, 2001, plaintiff was "terminated from employment with the City." This letter advised that "[t]his action was based on the findings and recommendation of [the hearing officer] in his ruling of May 8, 2001." The mayor made no mention of the assignment judge's directions.
*1084 On May 21, 2001, plaintiff appealed the City's determination to terminate her employment to the Merit System Board.
On July 16, 2001, the City issued another preliminary notice of disciplinary action, charging "other sufficient cause for discipline," namely, the assignment judge's May 9, 2001 directive that plaintiff be removed from her position as deputy municipal court administrator. On August 14, 2001, the City issued a final notice of determination on these newer charges, and again determined that removal from employment was appropriate. Plaintiff appealed this decision to the Merit System Board as well.
A few days later, on August 17, 2001, the assignment judge wrote to the City regarding the "great confusion" caused by his May 9, 2001 letter, which he sought to alleviate by stating:
After reviewing the report and recommendation of . . . the hearing officer, I concluded that Ms. Thurber was not fit to continue in the position of Deputy Court Administrator in Burlington City, a conclusion which I continued to hold. However, my use of the word "termination" has obviously been misconstrued. I am simply directing that Ms. Thurber be removed from her position in the Municipal Court. The issue of her continued employment in the City of Burlington in some other capacity is solely within your authority.
The assignment judge directed that the second notice of disciplinary action should be withdrawn "because it is simply unnecessary" and that the case "should proceed before the Office of Administrative Law as a contested matter, and you will thereafter decide what action you will take, if any." Not heeding this direction, the City decided not to voluntarily dismiss or withdraw this second charge, apparently because the position of deputy municipal court administrator, as its attorney later wrote, "did not. . . qualify her for any other City position."

II
These appeals to the Merit System Board were transferred to the Office of Administrative Law. Initially, an Administrative Law Judge (ALJ) heard argument regarding the consolidation of plaintiff's appeals and the City's motion for summary disposition. The ALJ issued a written decision on March 20, 2003, ordering that the appeals be consolidated and rejecting the City's argument that, because plaintiff worked in the municipal court, she did not have a right to appeal the City's actions to the Merit System Board. Relying upon R. 1:33-4, the ALJ held that although the assignment judge, as the Chief Justice's representative, had the final authority over personnel in the municipal courts within the vicinage, "that does not mean that she is or remains unfit for any other municipal employment." As a result, the ALJ concluded that a hearing would thereafter be conducted regarding the September 16, 2000 incident and the City's decision to terminate plaintiff.
On June 23 and 30, 2003, the ALJ heard the testimony of Officers Robb and Tedesco, plaintiff, and Dr. Ball. On August 16, 2004, the ALJ rendered a thorough written decision, containing his findings of fact and legal conclusions.
In examining the evidence regarding what transpired on September 16, 2000, the ALJ found there was no dispute that plaintiff was under the influence of alcohol at the time she was pulled over for speeding, during the events that transpired at the site of the motor vehicle stop, and while she was processed at the Cherry Hill Police Department. He held that plaintiff registered 0.10 and 0.11 blood alcohol content (BAC) readings on a breathalyzer, which "conclusively establish[ed] that *1085 [plaintiff] was, at least in the eyes of the law, under the influence of alcohol."
The ALJ observed that there was also "a significant dispute" about whether Xanax played any role in plaintiff's behavior on September 16, 2000. He stated in his written decision that "Officer Tedesco testified credibly that he heard [plaintiff] decline to perform the field sobriety tests, `stat[ing] in effect that she could not do the tests because she suffered from panic attacks,'" and that Officer Tedesco also heard plaintiff state "`that she was on Xanex [sic] and she refused to perform[] any more tests.'" The ALJ found that Officer Tedesco was "a very credible witness" and that he had "little if any doubt that he heard [plaintiff] say she was `on' Xanax." The ALJ, however, found that there were "any number of plausible reasons for her having said it," including that she said it in the "hope of not having to take the field sobriety tests and go home with just a speeding ticket in hand." This and other plausible, conflicting reasons for plaintiff's statement regarding the ingestion of Xanax led the ALJ to conclude that he could not find by a preponderance of the evidence that plaintiff had ingested Xanax at or about the time of the incident. He also observed that, even if he had found otherwise, there was no evidence regarding the amount of Xanax taken or whether or to what extent it may have contributed to her behavior. And, lastly, the ALJ concluded that he was persuaded by Dr. Ball's "uncontroverted testimony that [plaintiff's] conduct was not consistent with someone who had mixed Xanax and alcohol." As a result, the ALJ determined that there was no legitimate or persuasive explanation for plaintiff's "sudden Jekyll/Hyde-like" change in demeanor other than the explanation provided by Dr. Ball's testimony.
Dr. Ball testified as to the nature of panic attacks and opined that plaintiff suffered from such an attack during the police encounter on September 16, 2000. The ALJ thoroughly explained Dr. Ball's description of the nature and cause of panic attacks in his written decision, including his following observations:
Dr. Ball described a panic attack as "a sudden surge of mounting psychological arousal that can occur `out of the blue' or in response to encountering a phobic situation." Physical symptoms present at the onset of an attack may include heart palpitations, tightening in the chest or shortness of breath, choking sensations, dizziness, faintness, sweating, trembling, shaking and/or tingling in the hands and feet. Concomitant psychological reactions often include fears of having a life-threatening illness, "going crazy," or losing control. During an intense panic attack, an individual may feel very confused and disoriented, and experience an intense urge to run away.
Dr. Ball went on to explain that panic attacks can be triggered by a "fight or flight" response, or can be completely spontaneous. In a spontaneous panic attack, the body experiences exactly the same physiological flight reaction that it would in a truly life-threatening situation. Although the causes of spontaneous panic attacks remain unknown, it is clear that individuals who have been undergoing prolonged stress or have recently suffered a significant loss are much more prone to experience them than the average person.
Whether the initial cause is apparent or spontaneous, it is how the individual perceives and responds to the physiological changes that will determine if he or she has a full-blown attack. As a general rule, people who panic are likely to become preoccupied with the changes in their bodies or moods, and will have an increased tendency to interpret slight *1086 aberrations as being dangerous or catastrophic. Should the panic develop into a full-blown attack, the long-term effect is likely to be traumatic, leaving the individual feeling terrified and helpless, with strong anticipatory anxiety about a possible recurrence. As a result, the feelings of panic are recurrent, even in those individuals who have been in remission, although the frequency of recurrence varies among individuals.
Dr. Ball concluded that plaintiff suffered a "severe" panic and anxiety attack on the night of September 16, 2000. Dr. Ball was persuaded to this view, and the ALJ persuaded to Dr. Ball's view, by the fact that plaintiff "had lost control of her bowels while the police officers were attempting to cuff her," which was, in the ALJ's words, "the physiological reaction of an individual experiencing an intense amount of fear." In summarizing his findings, the ALJ held that "[g]iven Dr. Ball's uncontroverted testimony, a BAC of between 0.10 and 0.11, and the absence of evidence establishing that [plaintiff] actually ingested a finite quantity of Xanax while under the influence, the only logical explanation for [plaintiff's] conduct is that she did, indeed, suffer an intense panic and anxiety attack [and][c]onsequently, she should not be held responsible for the combative and violent conduct in which she engaged after the officers placed her under arrest and attempted to handcuff her."
The ALJ, however, held that this panic attack did not explain or excuse her earlier conduct. Prior to the panic attack, as the ALJ found, plaintiff was able to: drive over the speed limit; ignore Officer Robb's repeated directives for her to put down her phone; call another police officer instead of complying with Officer Robb's orders; ask Officer Robb why he asked her to exit the vehicle; have another discussion on her cell phone; and recite the alphabet correctly during the field sobriety test. Considering that plaintiff held a responsible position in the judicial system and was expected to meet a high standard of conduct, the ALJ concluded that plaintiff's conduct prior to the panic attack "was contumacious and exhibited a lack of respect for a police officer," and he held that the City demonstrated by a preponderance of the evidence that plaintiff's conduct, "from the time she was stopped up to the point she was placed under arrest and was about to be handcuffed," represented conduct unbecoming a public employee.
In turning to the discipline to be imposed, the ALJ found that plaintiff was to be considered "as having no prior disciplinary record," because she testified that she had a spotless record and, although the City argued to the contrary, the City presented no evidence of an alleged prior written reprimand. As a result of his findings as to what occurred on September 16, 2000, and the impact of plaintiff's panic attack on a portion of her conduct that night, the ALJ determined that removal was inconsistent with the doctrine of progressive discipline and drew the following conclusions regarding what he believed would be a more appropriate discipline justified by the circumstances he found to have occurred:
As a deputy municipal court clerk, [plaintiff] comes into daily contact with members of the public, including those who had been arrested for driving under the influence. She must be made to understand that as a public official and, more significantly, as a judicial employee, she is held to a higher standard and must avoid even the appearance of impropriety. Therefore, upon considering all of [plaintiff's] pre-arrest actions as one overall course of conduct, I have concluded that even though she does not have a prior disciplinary record, a six-month suspension is appropriate.
*1087 The ALJ also determined that plaintiff was entitled to back pay, as well as all other employment benefits, and such counsel fees as the Merit System Board might deem appropriate.

III
Exceptions to the ALJ's decision were filed. The Merit System Board, in its written decision of May 5, 2005, decided to adopt the ALJ's findings of fact and conclusions of law in all respects, except that it did not adopt the conclusion, more fully discussed in the ALJ's initial March 20, 2003 decision, that the Board did not have the ability "to reinstate [plaintiff] to the Deputy Municipal Court Administrator title in the City's municipal court."
The Board thoroughly reviewed the circumstances and concluded that it was authorized to direct the reinstatement of plaintiff to her position as deputy municipal court administrator. In this regard, the Board concluded that it had jurisdiction, emphasizing that "the City . . ., not the Judiciary, is the appointing authority for municipal court personnel," and that it is the Board which is specifically authorized by N.J.S.A. 11A:2-6(a)(1) to render the final administrative decision on appeals concerning permanent career service employees in situations involving potential removal. The Board did not dismiss the significance of R. 1:33-4, which expresses the authority of the assignment judgeas the Chief Justice's representativeover the supervision, superintendence, and allocation of judges and personnel having a support function in the vicinage. But the Board also considered the historical "collaborative effort" between the judiciary and the Board in similar circumstances in concluding that it had jurisdiction to reinstate plaintiff to her former position with the municipal court.
In this last respect, the Board observed, among other things, that in 1993 the Board had ordered the Office of Personnel Management (OPM) to develop new job specifications for the title of municipal court administrator and municipal court director jointly with the former County and Municipal Government Services Division (CMGS), and in consultation with the Administrative Office of the Courts. The Board observed that by 1995 the OPM and CMGS developed "new standards for approval of appointments to the titles of Municipal Court Administrator and Director," and also that "these standards were developed as a result of the establishment of a joint team consisting of representatives of OPM and CMGS, and the Administrative Office of the Courts," and that this joint team developed job specifications for "the unclassified titles of Municipal Court Director and Deputy Municipal Court Director (First Class City); and for the career service titles of Assistant Municipal Court Director, Chief Municipal Court Administrator, Assistant Chief Municipal Court Administrator, Municipal Court Administrator, and Deputy Municipal Court Administrator." Viewing the adoption of these job specifications by this joint team, the Board held that the unmistakable intent of all involved, including the Administrative Office of the Courts, was that the Board would be empowered to grant full and meaningful relief to career service employees holding such positions:
Given this level of participation by the AOC in this project, in which the catalyst was the question surrounding appointments to the unclassified service within the Municipal Court title series, it appears that the AOC was satisfied in 1995 that the Deputy Municipal Court Administrator title should be allocated to the career, rather than unclassified service. In this regard, it is noted that R. 1:33-4, including paragraph (e), authorizing the appointment and discharge authority for judicial support personnel within the vicinage, was in effect prior to *1088 the joint evaluation of the standards required for appointment to either the unclassified or career service title. As such, since the AOC participated in the evaluation and recommendations surrounding appointments to this title series, had it not wanted incumbents in the Deputy Municipal Court Administrator title to serve in the career service, with the appeal rights to the Board associated with such an appointment, it is likely that issue would have surfaced in 1995. As such, since [plaintiff's] title is a career service title, the Board's authority in these matters is not just limited to what amounts to pro forma appeal rights for the sake of the appearance of due process. Rather, in order for an appellant to be provided with a meaningful remedy as a result of the appeal process, the Board must be empowered to provide the same remedies available for all other career service employees.
The Board also based its conclusion that it was authorized to order the reinstatement of plaintiff to her former position on the Legislature's enactment of N.J.S.A. 2B:11-5(a), which directed that "[s]ubject to the judiciary's rights to create new unclassified positions and make unclassified appointments under court rule," and subject to other exceptions not relevant here, "the judiciary's personnel practices shall be governed by the State Government Services provisions of Title 11A of the New Jersey Statutes and the rules promulgated thereunder."
Thus finding that it was empowered to grant complete relief, the Board concluded that a six-month suspension was appropriate, that plaintiff was entitled to mitigated back pay, as well as all other benefits and seniority rights, but not counsel fees, and that the City was required to "immediately reinstate [plaintiff] to her permanent position" as deputy municipal court administrator.

IV
The City filed a notice of appeal with this court on June 17, 2005; plaintiff filed a notice of cross-appeal soon after. We also permitted the Judiciary and the assignment judge (hereafter collectively "the Judiciary") to intervene.
The City moved for a stay pending appeal. The Board denied the motion, and ordered the City to take steps to immediately reinstate plaintiff to her position with the municipal court. We denied the City's motion for a stay on November 2, 2005.
A few days later, plaintiff petitioned the Board for enforcement of its final order. On December 21, 2005, the Board directed the City to reinstate plaintiff to her position as deputy municipal court administrator no later than January 3, 2006 for reasons set forth in a written opinion. On January 2, 2006 we granted the Judiciary's emergent application, but we limited our emergent order solely to preventing plaintiff's "physical[] return" to her place of employment and subject also to the submission of briefs by the parties on an expedited schedule. Following the presentation of a formal motion, and the submission of briefs from all interested parties, on January 30, 2006, we continued the terms of our prior limited stay pending the disposition of this appeal; we also accelerated this appeal.
A motion for direct certification was denied by the Supreme Court on June 9, 2006.

V
In this appeal, the City and the Judiciary contend that the Board's exercise of authority over the disciplining of plaintiff was unconstitutional and in violation of the assignment judge's prerogatives, as delineated in R. 1:33-4. They also argue that, even if permitted to act in *1089 this matter, the Board's findings were erroneous and the sanction imposed was arbitrary, capricious and unreasonable. Plaintiff argues in her cross-appeal that the six-month suspension was excessive. We conclude (a) that the Board was authorized to review the City's termination of plaintiff and empowered to mandate the reinstatement of plaintiff to her position with the City as deputy municipal court administrator, (b) that we should defer to the Board's findings of fact because they are supported by the evidence in the record, and (c) that the six-month suspension imposed by the Board was commensurate with its findings as to the plaintiff's unbecoming conduct and entitled to our deference. Accordingly, we affirm the Board's final decision in all respects.

A
The judiciary's control over the administration of the courts and the complex relationship generated by the impact of that constitutionally based principle on personnel and labor concerns has been thoroughly explained elsewhere, see, e.g., In re P.L. 2001, Chapter 362, 186 N.J. 368, 895 A.2d 1128 (2006); In the Matter of Judges of Passaic County, 100 N.J. 352, 495 A.2d 848 (1985); Knight v. City of Margate, 86 N.J. 374, 431 A.2d 833 (1981); Passaic County Probation Officers' Ass'n v. County of Passaic, 73 N.J. 247, 374 A.2d 449 (1977), and need not be repeated or revisited here in any great depth. To briefly summarize, the primary reason for the adoption of a new constitution in 1947 was the people's desire "to establish a simple but fully integrated system of courts and to give the judiciary the power and thus to impose on them the responsibility for seeing that the judicial system functioned effectively in the public interest." Winberry v. Salisbury, 5 N.J. 240, 244, 74 A.2d 406, cert. denied, 340 U.S. 877, 71 S.Ct. 123, 95 L.Ed. 638 (1950). In reorganizing its judicial system through the adoption of the 1947 constitution, in the words of Dean Pound, the people of New Jersey exchanged "America's worst court system for America's best." Passaic County Probation Officers, supra, 73 N.J. at 253 n. 4, 374 A.2d 449 (quoting 31 Judicature 131 (1948)). Since the establishment of our fully integrated judicial system, our courts have wrestled with the "extremely subtle and complex" labor and personnel problems as affected by the judiciary's need to effectively manage the courts. Passaic County Judges, supra, 100 N.J. at 357, 495 A.2d 848.
Municipal courts, of course, are included within the scope of the "judicial power" defined in Article VI, Section 1, Paragraph 1 of the New Jersey Constitution, which is vested in the Supreme Court, the Superior Court, "and other courts of limited jurisdiction," see Knight, supra, 86 N.J. at 384-85, 431 A.2d 833; see also In re Yengo, 72 N.J. 425, 434-35, 371 A.2d 41 (1977); In re Mattera, 34 N.J. 259, 266, 168 A.2d 38 (1961), and are thus encompassed by the Court's rules and policies. In fulfilling the constitutional mandate to "make rules governing the administration of all courts in the State," N.J. Const. art. VI, § 2, ¶ 3, the Supreme Court established that the assignment judge subject to the rules of court and subject to the direction of the Chief Justice, who is "the administrative head of all the courts in the State," N.J. Const. art. VI, § 7, ¶ 1plays a large role in carrying out the policies and directives necessary to insure the efficient management of the judicial system within the vicinage. R. 1:33-4 memorializes the extent to which the Court has delegated its authority to assignment judges. That rule states, among other things, that the assignment judge "shall be the authorized representative of the Chief Justice for the efficient and economic management of all courts within the vicinage," *1090 thus enveloping "all such matters affecting county and municipal governments, including but not limited to budgets, personnel, and facilities." R. 1:33-4(b).
Despite this broad description of powers, not every personnel decision lies within the assignment judge's discretion nor should be determined through resort to the process envisioned in R. 1:33-4. As noted, the scope of the assignment judge's powers are limited by the policies of the Supreme Court and, even when a personnel matter may fall within the limits of R. 1:33-4, there are also circumstances that suggest deferral to administrative agencies. Having closely examining the issues raised in this appeal, we conclude that the Supreme Court did not intend that an assignment judge engage in a dispute concerning such a municipal employee's alleged unbecoming conduct and the discipline to be imposed and, also, that the Merit System Board's existing procedures and its considerable expertise in such matters warranted deferral, as a matter of comity, to the Board's determination.

1
As we have indicated, the scope of the assignment judge's authority is encircled by the directions and policies of the Supreme Court. Of keen relevance in this regard is Directive # 8-87, adopted by the Court in 1987, which established the "uniform minimum standards and conditions" required by R. 1:33-4(e), and which limited appointments in the "judiciary unclassified service" and the "appoint[ing] and discharg[ing] [of] judicial support personnel within the vicinage" to three categories: (1) "[k]ey members of the management teams in the vicinage," who have "significant administrative responsibilities, e.g., establishing and enforcing policies, preparing budgets, setting work goals, objectives, priorities and determining needs, and assigning staff," (2) direct and confidential support employees to the judges, and (3) positions of a highly technical nature with duties or requirements for which regular selection procedures are not viable. These descriptions do not remotely encompass deputy municipal court administrators, and we so hold.
We also observe, as the Merit System Board recognized, that there is a considerable history of cooperation between the Department of Personnel and the Administrative Office of the Courts in allocating job titles to either the unclassified service or career service. The record on appeal includes not only directive # 8-87 but also past correspondence between the Director of the AOC and the DOP, and other memoranda and reports, which demonstrate a working relationship between the courts and these departments despite the potential for conflict between the Supreme Court's constitutional authority to "make rules governing the administration of all courts in the State," N.J. Const. art. VI, § 2, ¶ 3, and the appointment, promotion and discipline of employees according to merit and fitness, which serves as the basis for the merit system contained in the New Jersey Civil Service Act, N.J.S.A. 11A:2-1 to -24. As a result, we are satisfied that the Court did not intend to have the powers enumerated in R. 1:33-4 envelop this particular disciplinary matter or others like it. That the authority to consider the removal or other significant sanction on a deputy municipal court administrator lies with the Merit System Board is further demonstrated by N.J.S.A. 2B:11-5(a), which declares that other than certain judicial employees that would not include plaintiff, "the judiciary's personnel practices shall be governed by the State Government Services provisions of Title 11A of the New Jersey Statutes and the rules promulgated thereunder." This statute was enacted over ten years ago, without *1091 any known attack on its constitutionality since.

2
Principles of comity have also been applied by our Supreme Court in permitting the resolution of personnel and labor conflicts by administrative agencies other than the judiciary. In Judges of Passaic County, the Court held that, in considering whether the county or the judiciary was to be designated as the employer for collective bargaining purposes, "the appropriate solution is to ask, as a matter of comity, that [the Public Employment Relations Commission] address the factual issues raised" in order that "the competing concerns of the judiciary and the County will be afforded a hearing before as detached and impartial a panel as can be provided." 100 N.J. at 367, 495 A.2d 848. Indeed, the Court's willingness to consider the views of other branches of government in personnel matters extends to its deferral to statutory enactments that impact upon public employees involved in the administration of justice. In this sense, although recognizing that the constitutional mandate to make rules governing the administration of all courts in the State "transcends the power of the Legislature to enact statutes governing those public employees properly considered an integral part of the court system," the Court has, in the same breath, engaged in a practice, since 1948, "with only occasional deviation, to accept and adopt legislative arrangements that have not in any way interfered with this Court's constitutional obligation" in Article VI, Section 2, Paragraph 3. Passaic Cty. Probation Officers' Ass'n, supra, 73 N.J. at 255, 374 A.2d 449. See also CWA Local 1044 v. Chief Justice, 118 N.J. 495, 501, 572 A.2d 613 (1990) (holding that, "in the spirit of comity," it is the Court's "policy that when a statute has an impact on our administration, we will follow it unless it interferes with the effective functioning of the courts"). In CWA Local 1044, the Court observed that the "reams of statutory material with which we have complied overwhelm the few instances when we have gone our own way." 118 N.J. at 501, 572 A.2d 613.
In considering the location of the line between the assignment judge's authority over judicial personnel within the vicinage's municipal courts and the authority of the Merit System Board over career service employees, we also consider the principles of comity referred to by the Supreme Court and whether the Board's exercise of authority over plaintiff, a deputy municipal court administrator, does or does not interfere with the administration of justice in the vicinage. In our judgment, the shared interests of the judiciary and the Merit System Board in both protecting employees from arbitrary removal and in securing the staffing and management of municipal court personnel that serves, and does not prejudice, the administration of justicecoupled with the Board's considerable expertise in personnel matterswarrants our determination that the Board's jurisdiction over the dispute must take precedence. Indeed, we observe that the assignment judge altered his initial approach to the problem, later indicating to the City that his determination to preclude plaintiff from working in the municipal court did not extend to plaintiff's continued employment by the City. The latter aspect, he observed, was a matter to be resolved by the Merit System Board. The assignment judge, in short, recognized the limits on the scope of R. 1:33-4 over a municipal court employee such as plaintiff.
Deferral to the procedures of the Merit System Board, as a matter of comity, is further warranted when recognizing the Board's considerable experience and its existing procedures as compared to the absence *1092 of a methodology for the assignment judge, in such a circumstance, to resolve such a dispute. Here, the assignment judge, in an ad hoc manner, directed the City to appoint an attorney[1] to conduct a hearing into what occurred on September 16, 2000, and then reviewed those findings without providing the parties with an opportunity to be heard. On the other hand, a forum for a full examination of the September 16, 2000 incident was provided by the Merit System Board; a plenary hearing was conducted by the ALJ, and his findings were thoroughly reviewed by the Merit System Board, an administrative agency which has extensive experience in such matters. The availability of these procedures thus presented yet another reason for the deferral as a matter of comity to the Board in this matter. See, e.g., Hinfey v. Matawan Reg. Bd. of Educ., 77 N.J. 514, 532, 391 A.2d 899 (1978) (holding that "[c]omity and deference to cognate tribunals are designed to assure that a controversy, or its most critical facets, will be resolved by the forum or body which, on a comparative scale, is in the best position by virtue of its statutory status, administrative competence and regulatory expertise to adjudicate the matter").
For all these reasons, we conclude that, although the line is not always clear as to when an assignment judge may exercise jurisdiction over a disciplinary matter involving a municipal court employee, principles of comity strongly suggest that the Judiciary should defer to the administrative competence and regulatory expertise of the Merit System Board.

B
Since we have determined that jurisdiction over the City's attempt to terminate plaintiff resided with the Merit System Board, see N.J.S.A. 2B:11-5(a), and, in any event, that principles of comity require deferral to the Merit System Board's jurisdiction over this disciplinary matter, we hold that we have jurisdiction over the Merit System Board's final decision, see R. 2:2-3(a)(2),[2] and, thus, consider whether we should defer to the Board's findings relating to plaintiff's conduct on September 16, 2000.
In reviewing such a determination, we apply the familiar standard governing the review of final agency decisions. That is, we recognize that a "strong presumption of reasonableness attaches to the actions of administrative agencies," Matter of Vey, 272 N.J.Super. 199, 205, 639 A.2d 724 (App.Div.1993), aff'd, 135 N.J. 306, 639 A.2d 718 (1994), and that a reviewing court will not ordinarily upset a determination by an administrative agency, such as the Merit System Board, "in the absence of a showing that it was arbitrary, capricious or unreasonable, or that it lacked fair support in the evidence, or that it violated legislative policies express or implicit in the Civil Service Act," Campbell v. Dep't of Civil Service, 39 N.J. 556, 562, 189 A.2d 712 (1963).
*1093 In an earlier portion of this opinion, we described the circumstances surrounding the September 16, 2000 incident, and the detailed findings rendered by the ALJ and adopted by the Merit System Board. These findings included the determination that plaintiff was intoxicated at the time of the motor vehicle stop, that she did not comply with the officers' directions, and that, as the police encounter progressed, plaintiff suffered a panic attack, which led to the more egregious conduct urged by the City and the Judiciary as a reason for her termination. The ALJ found that the pre-panic attack circumstances justified a finding of conduct unbecoming and sustained the City's contentions in that regard. The ALJ found, however, that plaintiff's suffering of a panic attack during this police encounter warranted his conclusion that plaintiff "should not be held responsible for the combative and violent conduct in which she engaged after the officers placed her under arrest and attempted to handcuff her." All these conclusions find support in the evidence adduced during the hearing conducted by the ALJ. The ALJ made credibility findings based upon his observations of the witnesses, and the Board thoroughly reviewed and adopted those findings. As a reviewing court, which has not had the opportunity to observe the witnesses or judge their credibility, we are in no position to be dismissive of the findings underlying the Merit System Board's decision. It suffices to say that there is evidence in the record to support the ALJ's findings. Accordingly, we cannot conclude that the findings which gird the Merit System Board's decision are arbitrary, capricious or unreasonable, and we can find no substance in the contrary assertions of the City and the Judiciary.

C
We lastly turn to the Board's issuance of a six-month suspension without pay. The City and the Judiciary argue that this penalty was too lenient and only removal will alleviate the ostensible shock to the public's confidence in the administration of justice caused by plaintiff's unbecoming conduct on September 16, 2000. Plaintiff, on the other hand, argues that the six-month suspension was too onerous. We reject both arguments and conclude that the Board's disposition of the matter was neither arbitrary, capricious nor unreasonable.
The New Jersey Civil Service Act, N.J.S.A. 11A:2-1 to -24, protects classified employees from arbitrary removal from their position or other unreasonable sanctions imposed by the appointing authority. See, e.g., Prosecutor's, Detectives and Investigators Ass'n v. Hudson Cty. Bd. of Freeholders, 130 N.J.Super. 30, 41, 324 A.2d 897 (App.Div.1974). In serious circumstances, the immediate removal of a classified employee may be appropriate, Golaine v. Cardinale, 142 N.J.Super. 385, 397, 361 A.2d 593 (Law Div.1976), aff'd, 163 N.J.Super. 453, 395 A.2d 218 (App.Div. 1978), but progressive discipline is the norm because it better serves the goal of providing employees with job security by shielding them from arbitrary sanctions, West New York v. Bock, 38 N.J. 500, 522-24, 186 A.2d 97 (1962).
In examining the propriety of the City's determination to terminate plaintiff and whether it comported with the practice of progressive discipline, the Board accurately concluded that the record is bereft of any evidence of the prior disciplining of plaintiff. In his August 16, 2004 written decision, the ALJ stated in this regard:
[Plaintiff] contends that she has had no prior discipline and enjoys a "spotless" record. The City, on the other hand, makes reference to a prior written reprimand, although there is no evidence of it in the record. In any event, the *1094 difference is so negligible as to be meaningless and, for purposes of imposing discipline, [plaintiff] may be considered as having no prior disciplinary record.
This conclusion accurately describes the content of the record.[3]
In weighing the absence of any prior discipline of plaintiff of any sort and the significance of the conduct found to be unbecoming, the ALJ properly viewed as excessive the City's decision to terminate this ten-year employee. He concluded that a six-month suspension would more than adequately redress plaintiff's breach of the high standard of conduct expected of a municipal court employee. The Board agreed with the ALJ's determination and we also agree, finding nothing arbitrary or capricious in these findings of fact.
The ALJ observed that plaintiff's position with the municipal court implicitly included a "standard of good behavior which devolves upon one who stands in the public eye as an upholder of that which is morally and legally correct." This is undoubtedly true and supports the issuance of a six-month suspension without pay,[4] but we would draw the line there and doubt the reasonableness of any greater penalty when the unbecoming conduct in question consisted of speeding, driving while under the influence of alcohol, and failing to comply with the directions of a police officer. Indeed, we cannot square plaintiff's termination or the imposition of a lengthier suspension as the means of restoring the public's confidence in the judiciary and those who work within the judicial system with the more lenient discipline imposed by the Supreme Court for the similar misconduct of municipal judges. See, e.g., Matter of Richardson, 153 N.J. 355, 709 A.2d 197 (1998) (holding a public reprimand warranted for a municipal judge convicted of driving while intoxicated); Matter of Carton, 140 N.J. 330, 658 A.2d 1211 (1995) (holding a public reprimand warranted for a municipal judge who gave legal advice in a pending criminal matter and who sent a fax to another judge before whom that matter was then pending); Matter of Blackman, 124 N.J. 547, 591 A.2d 1339 (1991) (holding a public reprimand warranted for a municipal judge's attendance at a social event hosted by a convicted felon).
The discordant sanction of terminationwhich the City attempted to impose and which the City and Judiciary herein trumpetcannot be justified in these circumstances. We cannot find the words which would rationally explain why a greater sanction, let alone termination, is warranted for a deputy municipal court administrator when lesser sanctions have been imposed for similar misconduct by members of the judiciary, who play a larger role in the administration of justice, and, thus, are likely when engaging in such *1095 conduct to more seriously shake public confidence in the administration of justice, than caused by the similar misconduct of a municipal clerk. Accordingly, we conclude that the Merit System Board's issuance of a six-month suspension was reasonable and by no means arbitrary or capricious.
Affirmed.
NOTES
[1] In light of our disposition of this appeal, we need not consider whether plaintiff's due process rights were violated by the City having been given the unilateral right to appoint a hearing officer whose findings played an overarching role in the City's decision to terminate plaintiff.
[2] Were this not so, then this court would likely have no jurisdiction to review the assignment judge's determination that plaintiff should have been terminated from her position with the City's municipal court. There is nothing in the rules of court or the structure of the judiciary itself that would suggest that the Appellate Division has jurisdiction to review the personnel decisions of an assignment judge. In light of our disposition of this appeal, we need not decide this question.
[3] We observe that included within the record on appeal is a letter dated June 1, 2005, written by the City's municipal judge, containing a litany of allegations regarding plaintiff's conduct as deputy municipal court administrator since the municipal judge's appointment in 1995. This information was forwarded to the Board well after the City's decision to terminate, well after the ALJ closed the record and rendered his decision, and nearly one month after the Merit System Board rendered its final decision. Because it obviously should not, this hearsay information has not played a role in our decision.
[4] We also observe that along with this suspension, plaintiff has been subjected to uncertainty about her position with the City for nearly six years. While a final decision has hung in the balance, plaintiff was required to secure other employment. Even though mitigated back pay and other benefits have been awarded, the uncertainty and delay implicit in the long course these proceedings have taken to reach this day have also been a form of discipline that should not be ignored in our review of the Board's final determination.